## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MONTGOMERY WARD, L.L.C., *et al.*, | ) | Case No. 00-4667 (KG) |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | |
| _____ | ) | **Re Dkt. Nos.: 6492 & 6522** |

## MEMORANDUM OPINION[1]

## BY: KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE

The issues confronting the Court, on cross-motions for summary judgment, arise from post-confirmation claims objections. The matter is complicated by an earlier bankruptcy.

## I. BACKGROUND

This is the Debtors'[2] second bankruptcy case in this Court. For reasons discussed below, the earlier case bears heavily upon the Court's decision.

On July 7, 1997, Montgomery Ward Holding Company and related entities ("Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). *See In re Montgomery Ward Holding Company*, jointly administered under Case No. 97-1409(PJW) ("Ward I"). On July 15, 1999, the Court

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052.

[2] The Court will refer to all of the Ward I and Ward II debtors as "Debtors," collectively and, where appropriate, as individual parties. Although it is unclear whether there is complete identity between the debtors in Ward I and Ward II, the parties have not indicated that the Court must account for any differences in the debtor rolls in reaching its decision.

confirmed a plan of reorganization (the "Ward I Plan") in connection with those cases. The Ward I Plan became effective on August 2, 1999. The Debtors emerged from Ward I with 100% of the equity owned by General Electric Capital Corporation ("GE"). GE also made loans to the Debtors on a secured basis and guaranteed the other asset based financing for a potential liability of almost $1 billion.

The Debtors did not meet their financial projections following emergence from bankruptcy. Sales were consistently below projections and expenses exceeded those contemplated in the Ward I Plan. Less than 18 months later, on December 28, 2000, the Debtors filed voluntary petitions in the cases now before the Court ("Ward II") for relief under Chapter 11 in order to effectuate an orderly liquidation of the then largest general retailer to sell substantially all of its assets in Chapter 11.

In Ward II, the Debtors had approximately $785 million in secured debt, over $28.5 million in priority and administrative debt, and almost $400 million in unsecured debt. Tens of thousands of consumers were affected. More than 25,000 employees lost their jobs and the retiree plans for almost 12,000 people were terminated.

By interim order, dated December 29, 2000 (D.I. 42) and final order dated January 16, 2001 (D.I. 205), the Court authorized the Debtors to liquidate their inventory in going out of business sales (the "GOB Sales"). By order, dated January 24, 2001, the Court approved the Debtors' agency agreement with a joint venture of almost every national liquidation agent (the "Joint Venture"). The Joint Venture completely liquidated the Debtors' inventory during

the first quarter of 2001.  The Debtors received approximately $933 million in gross proceeds from the GOB Sales, and the net proceeds of the GOB Sales were approximately $593 million.

Concurrently with liquidating their inventory, the Debtors filed a real estate disposition motion proposing the sale of the exclusive rights to find buyers for the Debtors' real property interests (the "Designation Rights").  The Debtors ultimately agreed to sell their Designation Rights to KRC Acquisition Corporation and its designee, Kimsward Corporation (collectively, "Kimco"), pursuant to a designation rights agreement (the "Designation Rights Agreement"), dated as of February 23, 2001, subject to higher and better offers at an auction. Kimco emerged from the auction as the winning bidder and on March 1, 2001, the Court issued an order authorizing the Debtors to sell their Designation Rights to Kimco pursuant to the Designation Rights Agreement (D.I. 796).  The Debtors' 277 real property locations were subject to the Designation Rights Agreement.  These properties were sold or assigned for gross sale proceeds of over $649 million.  GE received net sale proceeds of over $432 million, and the Debtors' estates received net sale proceeds in excess of $87 million.  The Debtors separately also sold their furniture, fixtures and equipment and other miscellaneous assets, including intellectual property, for over $28 million.

Two competing liquidating plans were submitted in Ward II.  In the plan proposed by GE (the "GE Plan"), GE agreed to guarantee payments of 20% to general unsecured creditors with allowed claims.  The alternative plan (the "Committee Plan") proposed by the Official

Committee of Unsecured Creditors (the "Committee") contemplated continuing the Committee's lawsuit against GE for equitable subordination and other remedies (Adv. Pro. No. 02-01663) (the "GE Adversary"). The Debtors' creditors overwhelmingly voted to accept the Committee Plan, and the Court entered an order confirming the Committee Plan on August 20, 2002 ("the Ward II Plan"). (D.I. 3616). The Committee declared the Committee Plan effective on October 10, 2002 (D.I. 4375). On the same date, the Committee entered into a plan administration agreement with NHB Assignments, LLC (the "Plan Administrator") serving as plan administrator.

Pursuant to the Committee Plan, the Committee continued to prosecute the GE Adversary and ultimately settled the case. In the settlement of the GE Adversary, GE paid the estate $58 million and waived all of its claims against the Debtors including, without limitation, GE's deficiency claims. The Committee estimated the total value of the settlement to be over $80 million. GE also provided a $10 million reserve (the "GE Reserve Account") to secure its continued obligations to pay the costs and expenses for preserving GE's collateral.

## II. **RELEVANT FACTS**[3]

Dika-Ward, L.L.C. ("Dika-Ward"), an Illinois limited liability company, is the assignee of two separate bankruptcy claims filed by State Farm Life Insurance Company ("State Farm") and Jolward Associates Limited Partnership ("Jolward"), respectively.

Debtors owned a parcel of land located at 2500 West Jefferson Street, Joliet, Illinois (the "Land"). On April 18, 1973, Debtors entered into a Reciprocal Construction, Operation and Easement Agreement (the "RCOEA") with Joliet Mall Associates ("Joliet Associates") and Wieboldt Stores, Inc. ("Wieboldt"). PAX 1. Pursuant to the RCOEA, Debtors, Joliet Associates and Wieboldt agreed, *inter alia*, to develop a mall (the "Jefferson Square Mall"), share access to the premises and share certain expenses. In addition, Debtors planned to develop the Land by building a Montgomery Ward department store (the "Department Store").

Under the RCOEA, Debtors and Wieboldt agreed to pay their *pro rata* share of common area maintenance ("CAM") expenses. Debtors had the right to opt out of the CAM agreement by giving at least 90 days' written notice to Joliet Associates. PAX 1, § 13.

On or about January 2, 1974, Debtors entered into a ground lease with Jolward, transferring to Jolward a leasehold interest in the Land upon which the Department Store would be constructed (the "Ground Lease"). PAX 2. Under the Ground Lease, Debtors

---

[3] In support of their respective motions for summary judgment, the parties submitted through declarations the documents upon which the Court bases its decision. *See* Declaration of Brent Weisenberg, dated August 27, 2007, with exhibits ("PAX ___"); and Affidavit of Marshall N. Dickler, dated July 17, 2007, with exhibits ("D-W Ex___").

leased the Land to Jolward for 30 years.  In return, Jolward agreed to pay Debtors $15,000 per quarter during the term of the Ground Lease.  PAX 2, § 6(a), Sch. B.

On October 1, 1974, Jolward entered into a Lease and Sublease Agreement with Debtors (the "Lease and Sublease Agreement").  Pursuant to the Lease and Sublease Agreement, Jolward: (1) subleased the Land underlying the Department Store back to Debtors; and (ii) leased the Department Store to Debtors for 30 years.  PAX 3, § 1.  Debtors agreed, *inter alia*, to indemnify Jolward from and against all liabilities arising from violation of any agreement affecting the Land and Building; and to purchase the Building from Jolward at the end of the lease term or in the event of damage, condemnation or uneconomic use.  *Id.*

On October 1, 1974, in consideration of a $3,748,500.00 loan from State Farm to finance the construction of the Department Store (the "Loan"), Jolward executed a note, promising to repay State Farm by December 1, 2004 and pay interest on the unpaid amount of the Loan at a rate of 8.25 percent per annum (the "Note").  PAX 4.  Debtors were not a party to the Note.  The Note was non-recourse and was secured by the Mortgage (see below). *Id.*

In order to secure payment for the Loan, on October 1, 1974, Jolward granted State Farm a security interest in its rights in and to the Ground Lease, the Lease and Sublease Agreement and the Department Store (the "Mortgage").  PAX 5. Debtors joined in execution of the Mortgage for the purpose of granting State Farm a security interest in its rights in and

6

to the Land, Department Store, and RCOEA.  Debtors assumed no personal liability for the payment of any principal, interest or premium on the Note.  In the event Jolward defaulted on the Mortgage, State Farm had no rights against Debtors.  PAX 5, Prelim. State.  The Mortgage was also non-recourse as to Jolward.

On October 1, 1974, Jolward and State Farm entered into an Assignment of Lease Agreement (the "Assignment of Lease Agreement").  PAX 6.  Under the Assignment of Lease Agreement, Jolward designated State Farm to receive all rents and all notices, demands and documents which Debtors were required to make under the Lease and Sublease Agreement, and directed Debtors to deliver to State Farm all rents payable to Jolward under the Lease and Sublease Agreement.  PAX 6, §§ 1, 3.

On September 24, 1986, certain of Wieboldt's creditors commenced an involuntary liquidation proceeding against Wieboldt.  On the same day, Wieboldt filed a voluntary reorganization proceeding.  In 1993, Joliet Associates, the owner of the Jefferson Square Mall, went into receivership.  On January 4, 1994, Massachusetts Mutual Life Insurance Company ("Mass Mutual") took over as the new owner of the Jefferson Square Mall.  PAX 9.  On April 1, 1996, Mass Mutual conveyed its interest in the Jefferson Square Mall to Jefferson Square Mall, LLC ("Jefferson").  Jefferson purchased the Jefferson Square Mall from Mass Mutual subject to the RCOEA.  PAX 9, 10.

<u>Ward I Claims</u>

In Ward I, on June 21, 1999, State Farm filed two proofs of claim: (i) an unsecured, non-priority claim, filed on behalf of Jolward, in the amount of $125,990.26, which consisted of $2,647.76 in alleged past due CAM charges and $123,342.50 in real estate taxes allegedly due under the Lease and Sublease Agreement (the "<u>First Jolward Claim</u>"); and (ii) a secured claim in the amount of $3,748,500.00 pursuant to the Mortgage (the "<u>First State Farm Claim</u>").  PAX 11, 12.

Debtors scheduled two claims on behalf of Jefferson: (i) Claim No. 31701, in the amount of $2,077.04; and (ii) Claim No. 31711, in the amount of $540.72 (the "<u>First Jefferson Claims</u>").  Jefferson did not file any claims.  PAX 13.

<u>The Ward I Plan of Reorganization</u>

State Farm filed a limited objection to the Ward I Plan requesting clarification that the Mortgage would not be discharged.  PAX 14.  In response to State Farm's objection, Debtors added the following paragraph to the Confirmation Order (PAX 15):

> <u>State Farm Mortgage</u>.  To the extent the mortgage dated October 1, 1974 bearing Document No. R74-29381 made by Jolward Associates, as mortgagor and Montgomery Ward Development Corp., as land owner, to State Farm Life Insurance Company, exists, and Debtors reserve their right to deny its existence, the mortgage, if it is ultimately determined to exist, is not discharged.

8

Debtors, through the Ward I Plan, assumed the Lease and Sublease Agreement, Assignment of Lease Agreement, Ground Lease and the RCOEA. PAX 18. Debtors did not terminate or reject either Note, or the Mortgage. PAX 19.

<u>The Ward I Claims Resolution Process</u>

On November 1, 1999, Debtors objected to the First Jolward Claim and the First State Farm Claim. PAX 21. On November 24, 1999, State Farm, on behalf of itself and Jolward, responded to the objection.[4] PAX 22.

On April 19, 2000, Debtors and State Farm, for itself and Jolward, entered into a stipulation (the "<u>Ward I Stipulation</u>") whereby Debtors allowed the First Jolward Claim as an administrative claim in the amount of $95,553.09 (the "<u>Allowed First Jolward Claim</u>"). PAX 24. On February 11, 2000, Debtors sent a check to State Farm in full satisfaction of the Allowed First Jolward Claim. PAX 25. Pursuant to the Ward I Stipulation, State Farm acknowledged that the First State Farm Claim "was not a prepetition or postpetition liability that was due and owing by [Debtors] and therefore, no distributions or cure obligations need to be made." PAX 24, § 1.

<u>The Ward I CAM Dispute</u>

On November 18, 1999, Jefferson began serving letters to Debtors alleging that Debtors underpaid CAM under the RCOEA. Pax 26. Jefferson demanded payment from

---

[4] Jefferson did not respond to the objection and the Jefferson Claims were expunged pursuant to an Order of the Court, dated January 6, 2000.

Debtors for CAM dating back to 1996 and an increase in monthly CAM. In a May 2, 2000 letter, Debtors notified Jefferson that it was opting out of CAM as of January 1, 2001 pursuant to Section 13(b) of the RCOEA. PAX 27.

Thereafter, on July 10, 2000, Marshall Dickler, on behalf of Jefferson, filed a complaint against Debtors in an Illinois state court claiming breach of the RCOEA and demanding $3,353,841.00 as deficient CAM payments for the period 1996 through 2000. PAX 29.

On August 2, 2000, Jefferson sold the Jefferson Square Mall to Dika-Jefferson. Marshall Dickler, a manager of Dika-Ward, is also a principal and manager of Dika-Jefferson. PAX 30.

After filing the second bankruptcy case discussed below, the Debtors rejected the Ground Lease and the Lease and Sublease Agreement.

<u>Ward II Claims</u>[5]

State Farm filed a proof of claim in the amount of $1,684,588.89 (the "<u>State Farm Claim</u>") based upon amounts due and owing under the Note and Mortgage. PAX 34. Dika-Ward, L.L.C. thereafter obtained an assignment of the State Farm Claim. State Farm later increased its claim to $2,358,069.64 to reflect additional interest and legal fees that had accrued after June 26, 2001.

---

[5] The Court will refer to the State Farm Claim and the Jolward Claim, where appropriate, collectively as "the Claims".

Jolward filed a proof of claim in the amount of $6,711,219.34 (the "Jolward Claim"). PAX 35. Jolward supplemented the Jolward Claim pursuant to a request for payment of administrative expenses under Section 503(b)(1) of the Bankruptcy Code. The Jolward Claim consists of (i) unpaid rent in the sum of $1,340,180; (ii) unpaid taxes; (iii) failure to repair and maintain the premises; (iv) an administrative priority claim in the amount of $27,128.75 for accrued and unpaid post-petition, post-rejection real estate taxes due for the administrative period of December 28, 2000 through April 16, 2001; (v) lease rejection damages in the amount of $3,081,000.75 that are due and owing under Section 502(b)(6) of the Bankruptcy Code; and (vi) pre-petition claims in the amount of $3,603,089.84 for sums due and owing under the RCOEA.

Jefferson and Dika-Jefferson also filed claims for unpaid CAM. They claimed secured claimant status. PAX 34, 36.

After Dika-Ward had purchased the Claims, State Farm assigned the Mortgage to Dika-Ward. Jolward, in turn, transferred the Building to Dika-Ward. Accordingly, after the parties executed the Ward II Stipulation, Dika-Ward and related entities owned the Note, Mortgage, Land, Building, the Jolward Claim and the State Farm Claim.

The Ward II Stipulation

In October 2001, Debtors, Dika-Jefferson and Jefferson entered into the Ward II Stipulation. PAX 32. The Court approved the Ward II Stipulation on October 22, 2001, and entered an Order on October 25, 2001 (D.I. 2221). Pursuant to the Ward II Stipulation, Dika-

11

Jefferson and Jefferson released Debtors from any and all causes of action arising out of the Ward II Proceeding and Debtors released Dika-Jefferson and Jefferson from any and all causes of action arising out the Land. In addition, pursuant to the Bankruptcy II Stipulation, Debtors conveyed the Land to Dika-Jefferson and Jefferson and Dika-Jefferson withdrew their proofs of claim.

## The Plan of Liquidation

On May 7, 2002, the Official Committee of Unsecured Creditors (the "Committee") filed the Third Amended Plan of Liquidation (the "Plan of Liquidation"). On August 6, 2002, this Court entered an Order confirming the Plan of Liquidation, which became effective on October 10, 2002. The Plan of Liquidation created the positions of the Plan Administrator and Plan Administration Committee, and gave them the exclusive right to make and prosecute objections to claims against the Debtors' estates.

## The Objections to the Ward II Claims

On February 15, 2002, the Committee filed a Verified Motion for an Order Disallowing Certain Claims for Which There is No Liability (D.I. 2737), which included the State Farm Claim on the grounds that the claim did not represent a valid obligation of the Debtors pursuant to the Ward II Stipulation (the "State Farm Claim Objection"). On February 27, 2002, Dika-Ward filed a Response to the State Farm Claim Objection (D.I. 2841) arguing that it was not a party to the Ward II Stipulation and that it did not agree to withdraw or waive the State Farm Claim.

12

On August 26, 2002, the Debtors and the Creditors' Committee filed a Second Verified Motion for an Order Disallowing Certain Claims for Which There is No Liability (D.I. 3630 & 3631), which included the Jolward Claim on the ground that it "asserts rights to lease rejection damages for which mitigation damages and environmental liability factors have not yet been determined" (the "Jolward Claim Objection"). On September 19, 2002, Dika-Ward filed a Response to the Jolward Claim Objection (D.I. 3817) arguing that it improperly categorized the Jolward Claim and that the objection was inconsistent with Sections §365(g) and 503(b)(1) of the Bankruptcy Code.

## The Dika-Ward Foreclosure

On October 2, 2001, State Farm assigned the Note and the Mortgage to Dika-Ward (PAX 41) and Dika-Ward then filed a Complaint to Foreclose Mortgage in Illinois state court.  PAX 42.  Dika-Ward and Jolward entered into a Stipulation and Agreed Order for Consent of Foreclosure, dated February 28, 2002.  PAX 43.  On the same day, a Judgment of Foreclosure was entered.  Pursuant to the Judgment of Foreclosure, the Building and Land were conveyed to Dika-Ward by Judicial Deed.  PAX 45.

## The Supplemental Objection

The Plan Administrator filed a Supplement to the Objection Regarding the Claims Asserted by Dika-Ward (the "Supplemental Objection") (D.I. 6424) on October 17, 2006. In the Supplemental Objection, the Plan Administrator argues that the transaction between Debtors, Jolward and State Farm constitutes a disguised financing arrangement and,

13

therefore, only State Farm, or its assignee, Dika-Ward, can exercise its remedies as a non-recourse secured lender against its collateral. However, if the transaction is found to be a true lease, the Plan Administrator further argues that Dika-Ward is only entitled to assert a single lease rejection damage claim, which could not include CAM charges because they were either discharged in Ward II, or settled pursuant to the Ward II Stipulation.

Dika-Ward filed its Motion to Strike the Supplemental Objection on October 31, 2006 (D.I. 6428), on the ground that the Plan Administrator failed to comply with Federal Rule 15 and Bankruptcy Rule 7015. The Court denied the motion and on February 23, 2007, Dika-Ward filed a Response to the Supplemental Objection (D.I. 6471). Dika-Ward argued that all of the Plan Administrator's supplemental objections fail because: (i) the Mortgage and Note passed unaffected through confirmation of the Plan in Ward I and became recourse to the Debtors and their assigns pursuant to Section 1111(b)(1) of the Bankruptcy Code; (ii) the argument that the Lease and Sublease Agreement and related transactions constitute a disguised financing arrangement is barred by the principles of *res judicata*, collateral estoppel, equitable estoppel and waiver; (iii) the CAM charges were not discharged in Ward I because the Plan provided otherwise; (iv) the CAM charges arise pursuant to a covenant that runs with the land, and are therefore nondischargeable and binding on the assignee in this bankruptcy case; and (v) the CAM charges were not released under the Ward II Stipulation because State Farm, Jolward and Dika-Ward were not parties to such stipulation.

14

## PROCEDURAL STATUS

Dika-Ward filed a Motion for Summary Judgment with Respect to Objection and Supplement to Objection of the Plan Administrator for Montgomery Ward, L.L.C., *et al.,* Regarding the Claims Asserted by Dika-Ward, L.L.C. (the "Dika-Ward Motion") (D.I. 6492) and Supporting Memorandum of Law (D.I. 6493). The Dika-Ward Motion seeks an Order: (1) granting summary judgment in favor of Dika-Ward; (2) overruling the objections contained in the Claims Objection Motion, the Second Claims Objection Motion and the Supplemental Claims Objection; (3) allowing the State Farm Claim and the Jolward Claim; and (4) granting such other relief as this Court deems proper.

The Plan Administrator filed an Opposition to Dika-Ward's Motion and Cross-Motion for Summary Judgment (the "Plan Administrator's Cross-Motion") (D.I. 6522), along with a supporting Memorandum of Law. The Plan Administrator's Cross-Motion seeks an Order confirming that the transaction at issue is a financing, the Mortgage and Note remain non-recourse and the Jolward Claim may not include CAM charges.

Dika-Ward filed a Reply Memorandum in support of its Motion and in opposition to the Plan Administrator's Cross-Motion (D.I. 6546).

Oral argument was held on October 4, 2007, after which Dika-Ward submitted a letter memorandum in response to Debtors' argument at oral argument. The matter is now at issue.

### III. <u>JURISDICTION</u>

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

### IV. <u>DISCUSSION</u>

<u>Legal Standard</u>

The Court is addressing cross motions for summary judgment. Summary judgment is proper if there is no genuine issue of material fact, and when viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Pearson v. Component Tech Corp.*, 247 F.3d 471, 482 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)); see also Fed. R. Civ. P. 56(c)).

In all cases, the court shall draw all reasonable inferences from the underlying facts most favorably to the nonmoving party.  Where the movant has produced evidence in support of its motion for summary judgment, the nonmovant cannot rest on the allegations of pleadings and must do more than create some metaphysical doubt.  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, Inc., 998 F.2d 1224 (3d Cir. 1993).

Once the moving party has made a proper motion for summary judgment, the burden shifts to the non-moving party, pursuant to Rule 56(e), which states, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not

16

rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific acts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Before a court will find that a dispute about a material fact is genuine, there must be sufficient evidence upon which a reasonable trier of fact could return a verdict for the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 91986). "[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 512 (3d Cir. 1994).

The parties to the disputed claims before the Court have filed cross-motions for summary judgment. Dika-Ward and Debtors have submitted and rely upon the documents to which the Court has referred, especially the Ward I Stipulation, Ward I Plan, Lease and Sublease Agreement, the Mortgage, the Note, the RCOEA, the Ward II Plan, the Ward II Stipulation, and the letter, dated May 2, 2000, the Ward II Stipulation and the Ward II Confirmation Order. The foregoing documents constitute the primary evidentiary record for the cross-motions for summary judgment as exhibits to the Weisenberg Declaration in Support of the Plan Administrator's Opposition and Cross Motion, and the Dickler Affidavit in support of Dika-Ward's motion for summary judgment.

The documents are unambiguous and their meaning is clear and readily discernable without the necessity of extensive explanatory evidence. Both sides to the dispute believe that there are no disputed facts – at least none that prevent them from prevailing. The issue which would not be appropriate for disposition on summary judgment is the recharacterization issue – whether the Lease and Sublease Agreement is a lease or disguised financing arrangement. However, because the Court holds, as explained below, that the doctrine of *res judicata* precludes the Plan Administrator's challenge, the factual disputes raised on the issue are not germane.

<u>Issues</u>

In objecting to the Claims[6], the Plan Administrator argues that:

1.      The true characterization of the transaction underlying the Claims is a disguised financing arrangement;

2.      The Debtors' interest in the Land and Building was valueless and only a burden to the Debtors' estates;

3.      The Debtors are not liable for the Loan or any deficiency relating thereto;

4.      If the Lease and Sub-lease are true leases, Dika-Ward may only assert a single rejection claim;

---

[6] The Plan Administrator's initial objection to the Claims was the garden variety assertion that the State Farm Claim did not represent a "valid obligation of the Debtor." Similarly, the objection to the Jolward Claim simply asserted that "mitigation damages and environmental liability factors have not yet been determined." As the Court discussed earlier, the Debtor filed a Supplemental Objection which the Court permitted by denying the Motion to Strike; and it is the more in-depth Supplemental Objection that raises the issues for the Court's decision.

5.      Debtors are not liable for accrued and unpaid CAM charges; and

6.      Debtors are not liable for any lease rejection claim because Dika-Ward released its claim in the Ward II Stipulation.

The Plan Administrator attacks the Jolward Claim on his assertion that the Lease and Sub-Lease Agreement, although labeled a lease, is in reality a disguised financing arrangement.  He claims that when Debtors purchased the Land to build the Department Store as part of the Jefferson Square Mall, they could have paid for the construction of the Building themselves through a construction loan secured by a mortgage on the Building in favor of a construction lender.  Instead, Debtors entered into a structured financing arrangement for tax reasons[7] whereby State Farm served as the construction lender and Jolward was a passive tax shelter entity.  Under this arrangement, Debtors enjoyed tax deductions for payments for the Building and Land made to State Farm on Jolward's behalf and Jolward avoided financial liability and at the same time received the tax benefits of the depreciation of the Building and interest payments under the Mortgage.  In turn, Jolward was a tax shelter which passed along the tax benefits of the interest on the Loan and the depreciation of the Building to its limited partners without financial risk to the investors.

---

[7]  Debtors explain that had they obtained a loan secured by a mortgage, only the interest portion of the mortgage payments would have been tax deductible and the principal would have represented additional debt on the balance sheet.  The financing arrangement enabled Debtors to reduce their tax liability on the Building, move the construction costs off their balance sheet and provide tax benefits to Jolward.

The Lease and Sub-Lease Agreement provided, in pertinent part, that (PAX 3):

1.    Debtors had the option to purchase the Building from Jolward on November 30, 1999 and November 30, 2004, the latter date being one day prior to the Note coming due in full (Section 15(b));

2.    Jolward had the right to demand that Debtors purchase the Building on specified terms (Section 16); and

3.    Debtors were required to purchase the Building from Jolward in the event of damage, condemnation or uneconomic use (Sections 14 & 15).

The Lease and Sub-Lease Agreement insured that Debtors' lease payments and all purchase price options covered Jolward's financial obligations to State Farm. Additionally, Debtors could not terminate the Lease and Sub-Lease Agreement. Instead, the Lease and Sub-Lease Agreement guaranteed that, in the end, Debtors would purchase the Building. The price for Debtors' purchase of the Building was calculated under the Lease and Sub-Lease Agreement to insure that the purchase price was approximately the amount outstanding under the Note thereby protecting Jolward against any financial liability.

### *Res Judicata*

Characterizing a transaction as a disguised financing rather than a lease is not a simple proposition. In this case, the Court may not engage in the exercise because the Plan Administrator's arguments are clearly subject to claim preclusion. While arguably "all is fair

in love and war," all is not fair in law and the Plan Administrator's attempt to litigate a resolved issue must fail.

The doctrine of *res judicata* is "[a] fundamental precept of common-law adjudication" and its application "is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions." *Montana v. United States*, 440 U.S. 147, 153 (1979). *Res judicata* "preclude[s] parties from contesting matters that they have had a fair and full opportunity to litigate, protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. *Id*. at 153-154. *Res judicata* bars the assertion of claims when three elements are present: "(1) a final judgment on the merits and a prior suit involving; (2) the same claim; and (3) the same parties or their privies." *E.E.O.C. v. United States Steel Corp.*, 921 F.2nd 489, 493 (3d Cir. 1990). The doctrine applies with equal force to final judgments rendered by the bankruptcy courts. *Stoll v. Gottlieb*, 305 U.S. 165, 170-172 (1938); *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 376-77 (1940).

This Court, by then Chief Judge Walsh, addressed *res judicata* in the context of plan confirmation in *In re Ampace Corporation*, 279 B.R. 145, 154-55 (Bankr.D.Del.2002). After discussing the general principles of the doctrine of *res judicata*, Chief Judge Walsh held:

> In the context of bankruptcy, most courts find that a confirmation order constitutes a final judgment on the merits with respect to the issues addressed in the plan of reorganization. See, e.g., *Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 336, n. 11 (3d

Cir.2000); *Donaldson v. Bernstein*, 104 F.3d 547, 554 (3d
Cir.1997); *In re Varat Enter.,* 81 F.3d at 1315; *Heritage Hotel Ltd.
P'Ship I v. Valley Bank of Nevada* (*In re Heritage Hotel P'Ship I*),
160 B.R. 374, 377 (9th Cir.BAP 1993).  In addition, "[a] party for
the purposes of former adjudication includes one who participates
in a Chapter 11 plan confirmation proceeding." *In re Varat Enter.*,
81 F.3d at 1315; see also *CoreStates*, 176 F.3d at 195 ("We
believe . . . that claim preclusion should apply regardless of the
jurisdictional basis of the present claim and between all parties to
a bankruptcy case.") With respect to whether a subsequent action is
based on a cause of action that was or could have been addressed in
a prior proceeding, relevant case law suggests that courts in the
Third Circuit consider whether there is an "essential similarity of
the underlying events" giving rise to the claims. *Eastern Minerals*,
335 F.3d at 337 (citing *155 *United States v. Athlone Indus., Inc.*,
746 F.2d 977, 984 (3d Cir.1984)); *CoreStates*, 176 F.3d at 200.
However, in *Eastern Minerals*, the Third Circuit recently
recognized that "the 'essential similarity' test, when literally
construed, is ideally suited for litigation that has been generated by
discrete events" and not for litigation arising in the context of
bankruptcy. 225 F.3d at 337.  In that case, a creditor commenced
an alter ego action against a former chapter 11 debtor's sole
shareholder in state court seeking to recover a portion of a settled
claim that remained unpaid after the debtor's bankruptcy case was
closed. *Id.* at 333.  In finding that the doctrine of *res judicata* did
not bar the creditor's alter ego claim, the Third Circuit stated:

> Claim preclusion doctrine must be properly
> tailored to the unique circumstances that arise
> when the previous litigation took place in the
> context of a bankruptcy case.  Difficult as it may
> be to define the contours of a cause of action in a
> bankruptcy setting, we conclude that a claim
> should not be barred unless the factual
> underpinnings, theory of the case, and relief
> sought against the parties to the proceeding are so
> close to a claim actually litigated in the
> bankruptcy that it would be unreasonable not to
> have brought them both at the same time in the
> bankruptcy forum.

22

*Id.* at 337-38; accord In re Mariner, 267 B.R. at 53-54.

*Ampace* involved a post-confirmation preference action.   Nonetheless, it is persuasive authority for determining that *res judicata* is applicable here.

In the Ward I Plan, the Court approved the following provision (D-W Ex E at ¶ 7.04):

> Post-Petition Executory Contracts and Unexpired Leases. Executory contracts and unexpired leases entered into or assumed and other obligations incurred after the Petition Date by any Debtor will be performed, in accordance with the Restructuring Transactions, by the Debtor, Reorganized Debtor or by New Retailers, as applicable, in the ordinary course of its business, and such executory contracts and unexpired leases and other obligations will survive and remain unaffected by entry of the Confirmation Order.

The Confirmation Order approving the Ward I Plan provides (D-W Ex. G at ¶ 56) that:

> State Farm Mortgage.  To the extent the mortgage dated October 1, 1974 bearing Document No. R74-29381 made by Jolward Associates, as mortgagor and Montgomery Ward Development Corp., as land owner, to State Farm Life Insurance Company, exists, and Debtors reserve their right to deny its existence, the mortgage, if it is ultimately determined to exist, is not discharged.

Finally, the Ward I Stipulation resolving the Lease and Mortgage proofs of claim which State Farm filed in Ward I provides that (D-W Ex. H):

> 1.    Proof of claim number 12889 has been allowed as an administrative claim under the First Amended Plan in the amount of $95,553.09 (the "Administrative Claim") and the Claimant hereby acknowledges that it has received payment in full satisfaction of the Administrative Claim.

> 2.      Pursuant to section 4.2 of the First Amended Plan and paragraph 56 of the order confirming the First Amended Plan, proof of claim number 12900 shall be classified and allowed as an MW Class 2A Allowed Secured Claim (the "MW Class 2A Claim") and, thus, the legal, equitable and contractual rights represented by the MW Class 2A Claim shall remain unaltered.  Furthermore, the Claimant hereby acknowledges that proof of claim number 12900 does not represent a pre-petition or post-petition liability that is currently past due and owing to the Claimant, and therefore, no distributions, monetary payment or other cure obligations need be made or satisfied by the Reorganized Debtors on account of proof of claim number 12900.

Dika-Ward argues that in Ward I the Debtors assumed the Lease and Sublease Agreement, objected to the underlying claims, entered into the Ward I Stipulation resolving such claims objections and thereby recognized the validity of the Lease and Sublease Agreement, allowed the related claims, proposed plan provisions recognizing and retaining the Lease and Sublease Agreement, and obtained the Ward I Confirmation Order which placed the Court's imprimatur on the Lease and Sublease Agreement.  Further, in Ward II the Plan Administrator rejected the subject leases.  State Farm is correct in asking why, after all of the foregoing actions, the Plan Administrator is questioning the character of the Lease and Sublease Agreement.

The first two factors necessary for the Court to find that the Plan Administrator's challenge to the nature of the transaction is precluded by *res judicata* are present.    The Ward I Confirmation Order constitutes a final judgment on the merits.  The parties and/or their predecessors in interest participated in the Ward I Plan confirmation proceeding.  It is also beyond question that the Plan Administrator's cause of action, the characterization or

re-characterization of the Lease and Sublease Agreement, were addressed in the Ward Stipulation. The Court is fully satisfied that, as required in bankruptcy, the "factual underpinnings, theory of the case and relief sought are so close. . .that it would be unreasonable not to have brought them. . ." in Ward I. *Eastern Minerals*, 225 F.2d at 337 - 38.

At oral argument, the Plan Administrator cited five cases to support his position that *res judicata* is not applicable because the Plan Administrator is not bound by actions and decisions of a debtor in a prior bankruptcy. *See*, *In re Cowden*, 337 B.R. 512 (Bankr.W.D.Pa. 2006); *In re Silver Mills Frozen Foods, Inc.*, 32 B.R. 783 (Bankr.W.D.Mich. 1983); *In re Labrum & Doak, LLP*, 237 B.R. 275 (Bankr.E.D.Pa. 1999); *In re Community Hospital of Rockland County*, 15 B.R. 785 (Bankr.S.D.N.Y. 1981); and *In re Litas International, Inc.*, 1996 WL 617776 (Bankr.S.D.N.Y.).

The Court has carefully reviewed these cases and is satisfied that they are either inapposite or not persuasive authorities. The common theme in the cited cases is that a debtor's actions taken without representation of creditors is not entitled to preclusive effect.

In *Cowden*, the Court held that *res judicata* did not bind a Chapter 7 trustee who had brought litigation to avoid fraudulent pre-petition transfers made by a debtor which were the subject of a settlement agreement between the debtor and her husband, and the debtor's deceased father, and which the bankruptcy court had approved. The court held that the settlement did not bind the trustee because the general creditors' interests were not

represented in the settlement and the trustee was not a party to the settlement. Here, the Debtors and the Creditors Committee in Ward I had standing as representatives of the Debtors' estates to have addressed the disguised financing arrangement.

*Silver Mill* involved a Chapter 11 case which was converted to a Chapter 7 case. Litigation between parties during the pendency of the Chapter 11 case was settled pursuant to a court order. When the case was converted to a Chapter 7 case the trustee filed a preference action against one of the parties to the settlement and the court denied dismissal of the preference action on the ground of *res judicata* because the court found the trustee was not in privity with debtor since the debtor did not have the incentive to bring a preference action. Here, the Debtors and the Creditors Committee in Ward I had knowledge and could have asserted the disguised financing claim.

In *Labrum & Doak*, the basis for the *res judicata* assertion related to a pre-petition arbitration case resolved prior to the filing of the bankruptcy case. The court found that since the debtor was not acting in a representative capacity at the time of the arbitration case, *res judicata* did not apply in the subsequent bankruptcy proceeding.

In *Community Hospital of Rockland County* a Chapter 11 debtor attempted to subordinate tax liens. The bankruptcy court held that only a trustee and not the debtor could assert Section 724 of the Bankruptcy Code to subordinate the tax liens and when the Trustee thereafter reasserted the subordination claim, the Internal Revenue Service defended on *res judicata* grounds. The bankruptcy court rejected the *res judicata* defense because the court

had previously held that the Section 724 claim had not been available to the debtor and the trustee was therefore not bound. Unlike the *Community Hospital* case, the disguised financing claim was available to the Debtors in Ward I but was not pursued.

*Litas International* again involved a pre-bankruptcy judgment wherein the bankruptcy court held that *res judicata* did not preclude a trustee from pursuing a claim in bankruptcy because the rights of creditors had not been represented in the pre-petition, nonbankruptcy lawsuit. Here again, Dika-Ward's *res judicata* defense does not arise from a pre-petition, non-bankruptcy litigation but, rather, decisions made and actions taken or not taken during the pendency of the Ward I case.

More persuasive, and supporting Dika-Ward's *res judicata* arguments, is *In re Varat Enterprises Inc.*, 81 F. 3d 1310 (4th Cir. 1996). In that case, First Union, which had asserted a secured claim on debtor's assets, challenged the defendant's secured claim which the bankruptcy and district courts ruled was valid. On appeal, the appellate court determined that the bankruptcy and district courts had properly barred First Union from contesting the claim after confirmation of a plan of reorganization. The bankruptcy and district courts had ruled that First Union was barred from asserting its objection to defendant's claim by voting in favor of the plan of reorganization, that First Union which could have raised its objection pre-confirmation could no longer assert rights that were inconsistent with its provisions. The court of appeals therefore ruled as follows:

> When a confirmed plan discloses and specifically treats a creditor's claim, and another interested party has had a full and fair opportunity to contest the claim, that party cannot collaterally attack the bankruptcy court's order or confirmation. *Matter of Howe*, 913 F.2d 1138, 1147 (5th Cir.1990); *Combs v. Richardson*, 838 F.2d 112, 114 (4th Cir.1988). As discussed supra, First Union had a full and fair opportunity both before and during confirmation to raise the objections it seeks to make here. Thus, the court's order confirming Varat's plan and allowing Nelson, Mullins's claim resolved those issues and precludes First Union from relitigating them now.

The appellate court also discussed the principles of equitable estoppel and waiver and ruled that they, too, barred First Union's objection. The similarities between the case at hand and *Varat* are compelling. In Ward I, State Farm filed proofs of claim to which Debtors objected and thereafter settled. The Plan Administrator now disputes the status of State Farm's claims and, as in *Varat*, argues that the Ward I Plan mischaracterized the nature of those claims. The Debtors, with whom the Plan Administrator is in privity, did not object to the nature of the State Farm Claim in Ward I, agreed to it in the Ward I Stipulation, and in the presence of the factors necessary for the application of the *res judicata* doctrine, the Plan Administrator is now barred from challenging the character of the State Farm Claim.[8]

## Lease Claims

Having determined that the Plan Administrator's recharacterization is barred by the doctrine of *res judicata*, what remains for decision is Dika-Ward's rights under a true lease

---

[8] The Court will not discuss the applicability of waiver and equitable estoppel, having found that *res judicata* bars the Plan Administrator from asserting the disguised financing claim. It is clear, however, that even in the absence of *res judicata*, the Plan Administrator's recharacterization claim would be barred by equitable estoppel and waiver.

arrangement between Jolward and Debtors.  The Plan Administrator argues that Dika-Ward may assert only a lease rejection damage claim because the Note and Mortgage are expressly nonrecourse as to Debtors.  In addition, the Plan Administrator argues that Dika-Ward has no basis to assert CAM as part of the rejection damage claim because the CAM obligations were previously discharged and released in Ward I and, if not, Debtors settled all CAM obligations pursuant to the Ward II Stipulation.  As noted previously, Debtors were not a party to the Note and the Note is expressly nonrecourse.  Moreover, the Mortgage specifically provides (Section 7.8) that:

> . . .neither the Mortgagor nor the Mortgagee nor any successors or assigns of any of them nor any other person shall have any claim or right to proceed personally against [Debtors] for any sum or sums whatsoever, including but not limited to, deficiencies or sums owing on account of the indebtedness evidenced by the Note or this Mortgage. . . .

*    *    *

> It is understood and agreed to that the [Debtors] joins in the execution of this Mortgage solely for the purposes of subordinating any right, title and interest it may have in its fee interest in the Land Parcel and in the Ground Lease. . . .  Nothing herein contained shall be construed to enlarge upon or impose any further duty or liability upon [Debtors]. . . .

Dika-Ward argues that Debtors became personally liable on the Mortgage as a matter of law in Ward I because the provisions of 11 U.S.C. § 1111(b)(1) converted the nonrecourse debt to State Farm into recourse debt.  11 U.S.C. § 1111(b)(1) provides:

(b)(1)(a) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

Dika-Ward continues, in support of its argument, that since the class of creditors to which State Farm belonged did not elect for the application of 11 U.S.C. § 1111(b)(2), the property was not sold pursuant to § 363 of the Code or sold in conjunction with the Ward I Plan, the purported nonrecourse claim became recourse.

Pursuant to the Ward I Confirmation Order (D-W Ex. G at ¶ 56), the Mortgage was not discharged. In addition, the Ward I Stipulation provided that State Farm's claim

asserting a secured interest remain unaltered.  From these facts, Dika-Ward maintains that the Mortgage passed through the Ward I Plan unaffected and thereby became a recourse debt to Debtors pursuant to § 1111(b)(1) of the Code.  Dika-Ward's arguments are unavailing. Were the Court to accept Dika-Ward's position, the Court would inappropriately permit the rewriting of parties' contractual relations and rights by converting an agreement that was explicitly nonrecourse to an instrument that was recourse.  Neither the Bankruptcy Code section at issue   nor case law interpreting the Bankruptcy Code provision permit such handiwork.

It is clear that Section 1111(b) does not change the nature or character of an agreement.  It changes the nature of the claim.  Thus, for example, a non-recourse deficiency claim becomes a recourse claim.

Paragraph 56 of the Ward I Confirmation Order, cited earlier in this Opinion, preserved the Debtors' and State Farm's rights and the status quo of the Mortgage.  It did not change the parties' rights and the Note did not become recourse as a result of the Ward I Confirmation Order.  Similarly, the Ward I Stipulation dealt fully with bankruptcy claims and again did not change the terms of the Note.  Indeed, Debtors were not a party to the Note. It is clear that contractual rights were not altered in either the Ward I Stipulation or the Ward I Plan.

Section 1111(b) deals with claims in a Chapter 11 case, wherein a lien on a debtor's property is allowed as if a claimant had recourse against the debtor even if a creditor did not

have recourse.  As the authorities explain, the purposes of Section 1111(b) are to treat non-recourse creditors in the same manner as a creditor under state law where, even if the creditor lacks recourse, the debtor must pay the debt in full or lose the property, and to avoid forcing an undersecured creditor to bear the risk of an artificially low appraisal of its collateral by a bankruptcy court.  *See 4 Norton Bankr. L. & Prac.* 2D § 89:2 (2007).   The Plan Administrator ably described the operation of § 1111(b) by example.  *See* the Plan Administrator's Memorandum of Law in support of (I) Opposition to the Motion of Dika-Ward, LLC for Summary Judgment, and (II) Cross Motion for Summary Judgment (D.I. 6523), f.n. 14 at pp. 19-20.  The examples which the Plan Administrator provided describe the application of § 1111(b) on partially secured and undersecured creditors.

The case law is clear that § 1111(b) transforms non-recourse claims into recourse claims for distribution purposes only.  The plain language of § 1111(b), which must be given effect (*See Lamie v. United States Trustee*, 540 U.S. 526 (2004)), has given rise to decisions which support the proposition that § 1111(b) transforms non-recourse claims into recourse claims for distribution purposes only.  *See In re DRW Property Co.*, 57 B.R. 987, 992 (Bankr.N.D.Tex. 1986).  The *DRW* Property court held that:

> The transformation of non-recourse claims into recourse claims [pursuant to § 1111(b)] is for distribution purposes only in a Chapter 11 reorganization case where the debtor has been given the power to retain encumbered property. . .for use in its plan of reorganization.

In *DRW Property*, the court further acknowledged that in providing recourse status to non-recourse claims, claimants were not given additional rights under state law. Were Dika-Ward's reading of Section 1111(b) correct, an undersecured creditor such as Dika-Ward would have its non-recourse obligation converted to recourse for purposes of distribution under a plan and, in addition, receive recourse for all purposes post-bankruptcy. Accordingly, the Note and the Mortgage remain non-recourse as to Debtors.

<u>CAM Liability</u>

The Court has determined that the Lease and Sublease Agreement are to be treated as a true lease. Jolward may therefore assert a lease rejection damage claim against Debtors. Debtors argue that Dika-Ward may not assert CAM as part of the Ward II Jolward Claim for four reasons.

1. Debtors settled all of its CAM obligations pursuant to the Ward II Stipulation approved by this Court.

2. Jolward never paid CAM on behalf of Debtors.

3. Debtors' CAM obligations were discharged in Ward I.

4. Debtors are not obligated for any CAM accruing after January 1, 2001, because they properly opted out of CAM as of that date in accordance with the RCOEA.

<u>The Ward I Stipulation</u>

In the Ward I Stipulation, Jolward expressly acknowledged full satisfaction of its claim which includes CAM. PAX 24, ¶ 1. Accordingly, pre-Ward I CAM charges, if there are any, are no longer recoverable.

The Ward II Stipulation Releases
Debtors from any CAM Obligations

The Ward II Stipulation provides (D-W Ex. L, at ¶ 11) that:

> . . . Dika-Jefferson, LLC and Jefferson Square Mall, LLC hereby release and discharge [Debtors] from any causes of action, suits, debts, accounts, attorney's fees, promises, warranties, damages, consequential damages, agreements, costs, expenses or damages whatsoever in law or in equity, direct or indirect, arising out of or relating to the claims asserted by either in the [Ward II], or pursuant to the claims brought in the [State Court Proceeding] and asserted against [Debtors].

Dika-Ward argues that it should not be bound by the Ward II Stipulation because it was not a party to that stipulation.  The facts reveal that:

1.  Dika-Ward owned the Ward II Claims as of the date of the Ward II Stipulation.

2.  Marshall Dickler is a principal of Dika-Ward and Dika-Jefferson, the latter a party to the Ward II Stipulation.  PTO, ¶¶ 32, 25.

3.  Marshall Dickler was an attorney for Dika-Jefferson.  PAX 26.

4.  The Ward II Stipulation was signed by Thomas Goedert, as counsel to Dika-Jefferson and Jefferson.  Mr. Goedert is also counsel to Dika-Ward.  PAX 36, 37.

5.  Neither Thomas Goedert nor his law firm filed a 2019 statement with this Court stating that they represented Jefferson, Dika-Jefferson and Dika-Ward.

Dika-Ward alleges that Debtors should pay to settle the alleged unpaid CAM dispute because Jolward did not join in the Ward II Stipulation.  Debtors' point, which the Court adopts, is that even if Dika-Ward was not a signatory and Jolward was not a signatory, Dika-

34

Ward's principal and attorney were heavily involved in the negotiation and execution of the Ward II Stipulation. Indeed, the knowledge and participation of Dika-Ward representatives in the Ward II Stipulation process was sufficient to stop Dika-Ward from now challenging the Ward II Stipulation as a matter of equitable estoppel. *In re Varat*, 81 F.3d at 1317. The Court is thus satisfied that Debtors are not liable for unpaid CAM pursuant to the express terms of the Ward II Stipulation.

Jolward never paid for CAM. If Jolward had actually performed Debtors' CAM obligations, Jolward had a contractual right to assert a claim for reimbursement in the form of additional rent under Section 5(b) of the Lease and Sublease Agreement. However, Dika-Ward has provided no evidence that Jolward paid CAM under the RCOEA on Debtors' behalf. The Ward II Jolward Claim for CAM is expressly contingent on its being held liable for such expenses. Jolward has no claim for CAM charges it never paid. In the Ward II Stipulation, the former and current owners of the Jefferson Square Mall released Debtors from their CAM obligations and, accordingly, Jolward's contingent claim against Debtors never arose. Therefore, Dika-Ward has no claim.

Section 7.04 of the Plan of Reorganization Has No<br>Effect on the Dischargeability of the Alleged CAM Claims

Section 7.04 of the Ward II Plan provides that contracts and leases that were entered into or assumed postpetition would be performed in the ordinary course of business after Ward I and would not be affected by the Ward I Confirmation Order. Section 7.04 of the Ward I provides as follows:

35

**Post-Petition Executory Contracts and Unexpired Leases.**
Executory contracts and unexpired leases entered into or
assumed and other obligations incurred after the Petition Date
by any Debtor will be performed, in accordance with the
Restructuring Transactions, by the Debtor, Reorganized Debtor
or by New Retailer, as applicable, in the ordinary course of its
business, and such executory contracts and unexpired leases and
other obligations will survive and remain unaffected by entry of
the Confirmation Order.

Dika-Ward asserts that Section 7.04 of the Ward I Plan alters Debtors' discharge.
Section 7.04 does not impact the scope of the discharge granted to Debtors by the Bankruptcy
Code and the Ward I Plan. Instead, Section 7.04 clarified that entry of the Confirmation
Order did not change any of a non-debtor's, third- party's legal, equitable, or contractual
rights under agreements that were entered into or assumed outside of the plan of
reorganization. Such provisions have no impact whatsoever on Debtors' discharge. If the
Court accepted Dika-Ward's construction of Section 7.04, it would mean that Debtors
disclaimed the discharge the Bankruptcy Code provided with respect to all of its assumed
leases.

Dika-Ward also argues that the CAM charges cannot be discharged by Section 1141
of the Code and the Ward I Plan because the charges ran with the Land. *See In re Raymond*,
129 B.R. 354 (Bankr.S.D.N.Y. 1991). Dika-Ward's reliance on *Raymond* is misplaced.
Initially, this Court need not address whether the alleged CAM obligations ran with the Land
because Debtors fully satisfied its CAM obligations to Jolward by allowing and satisfying

the Ward I Jolward Claim.  *See* the Ward I Stipulation.  Jolward therefore had no additional CAM claims against Debtors as of the effective date of the Ward I Plan.

In the context of a chapter 7 individual debtor case, *Raymond* addressed whether a bankruptcy discharge encompasses postpetition condominium association assessments. Raymond did not address whether a bankruptcy discharge encompasses prepetition assessments in a chapter 11 corporate debtor case because it is clear from the unambiguous language of Section 1141 of the Bankruptcy Code that a debtor is discharged from such assessments.  The chapter 7 debtors in *Raymond* argued that the post effective date condominium assessments should be discharged because the assessments arose from a prepetition contract and were contingent prepetition claims subject to discharge.  Here, unlike in *Raymond*, Debtors do not dispute that the discharge applies only to CAM claims that arose prior to the Ward I Effective Date.

The rationale of *Raymond* was to prevent the chapter 7 debtors who had not paid the assessments post effective date to reside in their home unencumbered by the obligation to pay the assessments that their fellow condominium owners had to pay.  Here, Debtors never asserted that they not were obligated to pay CAM after the Ward I Effective Date and in fact, paid CAM after that date.  Thus, any CAM obligations that arose prior to August 2, 1999 under the RCOEA were discharged pursuant to the Bankruptcy Code, the Ward I Plan and the Ward I Confirmation Order.  Dika-Ward may not assert any CAM claim arising or accuring during that period as a matter of law.

Debtors are not liable for any alleged CAM arising after January 1, 2001 because they properly opted out of CAM pursuant to Section 13(b) of the RCOEA. *See* the May 2, 2000 Letter. By opting out, Debtors were "no longer. . . required to share in the costs and expenses of [maintaining the common area of the Jefferson Square Mall]." Section 13(b) of the RCOEA.

Accordingly, Dika-Ward's assertion of the Jolward Claim may not include a claim for CAM.

## CONCLUSION

The Court's decision results in the following:

1.      Dika-Ward's motion for summary judgment is granted on the issue of whether the transaction leading to its claims was a true lease or disguised financing, the Court having found that Debtors are precluded from raising the issue based on the doctrine of *res judicata*.

2.      Dika-Ward's motion for summary judgment is otherwise denied.

3.      The Plan Administrator's motion for summary judgment is granted on the CAM and recourse issues.

The Court's Order accompanies this Opinion.


Dated: March 12, 2008

                                                    UNITED STATES BANKRUPTCY JUDGE

38