**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 09-1735/1736

In re: MONTGOMERY WARD, LLC, et al,

Debtors,

DIKA-WARD LLC,

Appellant

Nos. 09-1745/1746

In re: MONTGOMERY WARD, LLC, et al,

Debtors,

PLAN ADMINISTRATOR OF MONTGOMERY
WARD, LLC; PA COMM OF MONTGOMERY
WARD, LLC,

Appellants

On Appeal from the United States District Court
for the District of Delaware
(D. C. Nos. 2-08-cv-00201; 2-08-cv-00202)
District Judge: Honorable Joseph J. Farnan

Argued on June 2, 2010

Before: JORDAN, ROTH and TASHIMA*, <u>Circuit Judges</u>

(Opinion filed March 9, 2011)

Theodore J. Tacconelli, Esquire
Ferry, Joseph & Pearce
824 Market Street
P. O. Box 1351
Wilmington, DE   19899

David K. Welch, Esquire  **(Argued)**
Crane, Heyman, Simon, Welch & Clar
Suite 3705
135 South LaSalle
Chicago, IL   60603

Counsel for Appellant

---

*Honorable A. Wallace Tashima, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

Daniel B. Butz, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street, 18th Floor
P. O. Box 1347
Wilmington, DE   19899

Richard S. Kanowitz, Esquire
Brent I. Weisenberg, Esquire  **(Argued)**
Cooley
1114 Avenue of the Americas, 47th Floor
New York, NY   10036

    Counsel for Appellee

O P I N I O N

**ROTH,** Circuit Judge:

  Dika-Ward filed a proof of claim in Montgomery Ward's second bankruptcy proceeding for amounts allegedly due under a mortgage and a lease.  The Bankruptcy Court, ruling on the parties' motion and cross motion for summary judgment, held that (1) Montgomery Ward was not personally liable under the mortgage, (2) Montgomery Ward had no liability for common area maintenance expenses under the lease, and (3) Montgomery Ward's Plan Administrator was precluded from challenging whether the lease was a true lease, as this was *res judicata* from Montgomery Ward's first bankruptcy proceeding.  Both parties appealed this order, and the District Court affirmed the judgment of the Bankruptcy

Court. We will affirm the summary judgment order as to the claims for the mortgage note and for common area maintenance. However, we will vacate the Bankruptcy Court's order, ruling that *res judicata* precluded the Plan Administrator's cause of action, and remand this case to the District Court for remand to the Bankruptcy Court so that the Plan Administrator may challenge the nature of the lease.

## I. **BACKGROUND**

Prior to its bankruptcy petitions, Montgomery Ward operated one of the largest retail merchandising organizations in the United States. Montgomery Ward's plans in the 1970s to develop the Jefferson Square Mall in Joliet, Illinois, and a new department store there gave rise to the disputed claims in this appeal. Montgomery Ward, Joliet Mall Associates, and Wieboldt Stores entered into a Reciprocal Construction, Operation and Easement Agreement (RCOEA) in which the parties agreed to develop the mall and share certain expenses, including common area maintenance and repair expenses (collectively referred to as Common Area Maintenance, or CAM, expenses).

Montgomery Ward contracted with Jolward Associates Limited Partnership (Jolward) to construct a department store (the Department Store) on a parcel of land that Montgomery Ward owned at the planned site of the Jefferson Square Mall (the Land). The parties entered into a Ground Lease whereby Montgomery Ward leased the Land to Jolward and Jolward agreed to construct the Department Store. Montgomery Ward consented to pledge its fee interest in the Land to secure financing for the Department Store's construction, with "it being expressly understood and agreed that Lessor

[Montgomery Ward] assumes no personal liability for the payment of any principal, interest or premium on the Notes by so doing."

State Farm Life Insurance Co. financed the Department Store's construction, with Jolward executing a note (the Note) secured by Jolward's rights in the Ground Lease, the Lease and Sublease Agreement (as described below), and the Department Store (the Mortgage). Montgomery Ward joined in the execution of the Mortgage to grant State Farm a security interest in its rights in and to the Land, the Department Store, and the RCOEA. The Mortgage agreement reiterated that Montgomery Ward "assumes no personal liability for the payment of any principal, interest or premium, if any, on the Note"; that is, the Mortgage was without recourse to Montgomery Ward.

Jolward leased the Department Store and the Land back to Montgomery Ward under a Lease and Sublease Agreement. Montgomery Ward received an option to purchase the Department Store at the end of the lease, and it agreed to indemnify Jolward for any expenses or liabilities incurred as a result of Jolward's interest in the estate.

Over twenty years later, in 1997 and again in 2000, Montgomery Ward filed bankruptcy petitions under Chapter 11 of the Bankruptcy Code. Creditors filed proofs of claim in each of these bankruptcies on account of the Mortgage and the Lease and Sublease Agreement, as described below.

5

### A. *Ward I*

In Montgomery Ward's first bankruptcy proceeding (*Ward I*), State Farm filed a proof of claim for the outstanding balance of the Mortgage. The Confirmed Plan of Reorganization (the *Ward I* Plan) provided for no distributions to State Farm on account of the Mortgage; State Farm simply retained its security interest.

The *Ward I* debtor-in-possession (the *Ward I* Debtor) assumed the Lease and Sublease Agreement, meaning that it agreed to continue to be bound by the agreement and to pay any past-due amounts to Jolward. State Farm, as assignee of Jolward's interest in the Lease and Sublease Agreement, filed a proof of claim for these past due amounts, including unpaid real estate taxes and CAM expenses (the Jolward I Claim).

The *Ward I* Debtor disputed the amount of the Jolward I Claim, including the allegedly unpaid CAM expenses. The parties settled this dispute, with State Farm receiving the full amount of its claim and acknowledging that its claim was fully satisfied (the *Ward I* Stipulation).[1]

### B. *Ward II*

Montgomery Ward filed its second Chapter 11 petition (*Ward II*) less than eighteen months after emerging from its

---

[1] Jefferson Square Mall did not file a proof of claim for unpaid CAM expenses. The *Ward I* Debtor scheduled two claims on behalf of the mall (the Jefferson I Claims), which the bankruptcy court expunged.

6

first bankruptcy proceeding, this time with the goal of winding down operations and liquidating assets. As part of this plan, the *Ward II* debtor-in-possession (the *Ward II* Debtor) rejected the Lease and Sublease Agreement.

Dika-Ward, an Illinois limited liability company, acquired State Farm's interests in both the Mortgage and the Lease and Sublease Agreement and filed two proofs of claim. First, it filed a proof of claim for the full amount of the Note and argued that, as a consequence of the *Ward I* bankruptcy, Montgomery Ward was personally liable for the full amount of that loan. Dika-Ward contended that the Mortgage, although initially nonrecourse, had become recourse in *Ward I* under Section 1111(b) of the Bankruptcy Code.

Second, Dika-Ward filed a proof of claim for lease rejection damages from the Lease and Sublease Agreement, which included allegedly unpaid CAM expenses (the Jolward II Claim). Dika-Jefferson – an affiliate of Dika-Ward that acquired the Jefferson Square Mall – also filed a proof of claim for unpaid CAM expenses (the Jefferson II Claim).

The *Ward II* Debtor entered into a settlement agreement with Dika-Jefferson as to the Jefferson II Claim, conveying its interest in the Land to Dika-Jefferson in satisfaction of the claim (the *Ward II* Stipulation). But the *Ward II* Debtor objected to the Jolward II Claim, and the *Ward II* Plan Administrator, who was appointed to represent the interests of the *Ward II* estate, filed a supplemental objection.[2] The supplemental objection asserted that the

---

[2] The Plan Administrator filed this objection together with the PA Committee of Montgomery Ward, LLC. For

Lease and Sublease Agreement was actually a structured financing, not a true lease. As such, the Plan Administrator argued that Dika-Ward's only remedy would be against the collateral securing that financing. The Plan Administrator contended alternatively that, even if the Lease and Sublease Agreement were a true lease, all CAM obligations were discharged and released in the *Ward II* Stipulation.

Dika-Ward responded by arguing that the *Ward I* Plan confirmation precluded the Plan Administrator from challenging the Lease and Sublease Agreement on principles of *res judicata*, equitable estoppel, and waiver.

Dika-Ward and the Plan Administrator moved and cross-moved for summary judgment. The Bankruptcy Court granted summary judgment for Dika-Ward on the *res judicata* issue, concluding that confirmation of the *Ward I* Plan barred the Plan Administrator from challenging the nature of the Lease and Sublease Agreement. The court held that the confirmation order in *Ward I* was a final adjudication on the merits, that the *Ward I* Debtor could have challenged the nature of the Lease and Sublease Agreement in its dispute concerning the amount of the Jolward I Claim, and that the *Ward II* Debtor (and Plan Administrator) were successors in interest to the *Ward I* Debtor. In *dictum*, the Bankruptcy Court noted that, even if *res judicata* did not apply, equitable estoppel and waiver would bar the Plan Administrator from challenging the nature of the lease.

---

simplicity, this opinion will collectively refer to these parties as "the Plan Administrator."

8

On the Dika-Ward Mortgage and the CAM expense claims, the Bankruptcy Court granted summary judgment for the Plan Administrator. The court held that section 1111(b) did not make the Mortgage recourse but merely, during the *Ward I* reorganization, granted the holder of the Mortgage a claim as if it were recourse. In addition, the court concluded that Dika-Ward had not established that Montgomery Ward was liable for any CAM expenses to Jolward. The parties appealed and cross-appealed this order, and the District Court affirmed, adopting the reasoning and analysis of the Bankruptcy Court. Both Dika-Ward and the Plan Administrator appealed to this Court.[3]

## II. DISCUSSION

### A. Res Judicata

*Res judicata* bars re-litigation of a claim if "there has been (1) a final judgment on the merits in a prior suit involving (2) the same claim and (3) the same parties or their

---

[3] The Bankruptcy Court had jurisdiction under 28 U.S.C. § 157(a); the District Court had jurisdiction under 28 U.S.C. §§ 158(a)(1) and 1334, and we have jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291.

"We exercise plenary review over the District Court's appellate review of the Bankruptcy Court's decision. We review the Bankruptcy Court's findings for clear error, and apply plenary review to its conclusions of law." *JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 119 (3d Cir. 2010) (*en banc*).

9

privies." *E.E.O.C. v. U.S. Steel Corp.*, 921 F.2d 489, 493 (3d Cir. 1990). The issue before us is whether the *Ward II* Plan Administrator, as successor in interest to the *Ward II* Estate, was the same party as, or privy of, the *Ward I* Debtor.[4]

The *Ward I* Debtor was a party to the *Ward I* Plan confirmation proceeding. Upon confirmation of that plan, the *Ward I* Debtor ceased to exist, and the reorganized Montgomery Ward succeeded to the *Ward I* estate. As Elizabeth Warren has explained,

> Three entities are involved in a successful Chapter 11 plan confirmation: the pre-bankruptcy debtor, the estate, and the post-bankruptcy business. The debtor gives way to the bankruptcy estate at the time of the initial filing, the estate gives way to the post-bankruptcy entity on confirmation of the plan, and the post-bankruptcy business survives the confirmation.

*A Theory of Absolute Priority*, 1991 Ann. Surv. Am. L. 9, 12 (1992). The filing of the *Ward II* bankruptcy resulted in a new estate, with the *Ward II* Debtor as trustee of that estate. *See In re Jamesway Corp.*, 202 B.R. 697, 701 (Bankr. S.D.N.Y. 1996).

---

[4] We note that the confirmation order in Ward I was a final judgment on the merits, *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir.1989), but we do not reach the issue of whether the two claims are identical for *res judicata* purposes because the privity issue is dispositive.

The *Ward II* Debtor, as trustee of that new estate, was not the same party as the *Ward I* Debtor. It was the *successor in interest* to the reorganized Montgomery Ward and the *Ward I* Debtor.

*Res judicata* may apply to a successor in interest, despite the general rule against nonparty preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).[5] The Court stated in

---

[5]*Taylor* listed the following five other exceptions to the general rule against non-party preclusion: (1) where the nonparty agrees to be bound by a prior judicial determination between other parties, (2) where the nonparty was adequately represented in the prior litigation by someone with the same interests, (3) where the nonparty assumed control of the prior litigation, (4) where the nonparty is the proxy or agent of a party to the prior litigation, and (5) where a special statutory scheme, such as bankruptcy, expressly forecloses subsequent litigation. *Id.* at 893-96.

None of these exceptions applies here. The *Ward II* Debtor did not agree to be bound by the *Ward I* Plan. The *Ward II* Debtor was not adequately represented by the *Ward I* Debtor, as the *Ward I* Debtor did not understand itself to be acting in a representative capacity. *Id.* at 900 (adequate representation requires that "(1) the interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty") (citations omitted). The *Ward I* Debtor was not the agent or proxy of the *Ward II* Debtor, as the *Ward II* Debtor did not yet exist during *Ward I*. The *Ward II* Debtor did not assume control of the *Ward I* proceeding. And

*Taylor* that nonparty claim preclusion applies if the nonparty had a substantive legal relationship with a party, and a successor in interest has such a relationship with its predecessor. *Id.* A trustee in bankruptcy, including a debtor-in-possession, may thus be considered the privy of the prebankruptcy debtor for *res judicata* purposes.[6] *In re WorldCom, Inc.*, 401 B.R. 637, 651 (Bankr. S.D.N.Y. 2009) ("a trustee is a successor to the property interests of the debtor, thereby placing them in privity"); *Edelman v. Mullins Orchards* (*In re Silver Mill Frozen Foods, Inc.*), 32 B.R. 783, 785 (Bankr. W.D. Mich. 1983) ("The trustee in bankruptcy is a successor to the bankrupt's property and for many purposes is deemed in privity with the bankrupt.").

---

finally, even though this case involves the bankruptcy statutory scheme, the last exception is not applicable here because it deals with claims that were discharged in a bankruptcy proceeding. *See, e.g.. Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989).

[6] The *Taylor* Court acknowledged that the term privity was often used to mean "substantive legal relationship," but the Court consciously avoided using the term "privity" because it is often broadly used "as a way to express the conclusion that nonparty preclusion is appropriate on any ground." 553 U.S. at 894 n.8.

We use the word "privity" and "privy" in this broader sense, "to say that the relationship between the one who is a party on the record and another is close enough to include that other within res judicata." *Nationwide Mut. Fire Ins. Co. v. Hamilton*, 571 F.3d 299, 311 n.13 (3d Cir. 2009) (internal quotation marks omitted).

12

However, even though a trustee in bankruptcy has a substantive legal relationship with the pre-bankruptcy debtor, the "[t]rustee is not simply the successor in interest to the Debtor: he represents the interests of all creditors of the Debtor's bankruptcy estate." *In re WorldCom,* 401 B.R. at 646 (internal quotation marks omitted). Because the trustee also represents the general creditors' interests, the legal relationship between the trustee and the pre-bankruptcy debtor is incomplete, particularly when the interests of the creditors diverge from those of the debtor. *In re Silver Mill*, 32 B.R. at 785.

In *In re Silver Mill*, Silver Mill filed for bankruptcy protection under Chapter 11 and continued to operate the business as a debtor-in-possession. As debtor-in-possession, it issued a check to one of its vendors to settle a contract dispute. A trustee in bankruptcy took over the administration of the estate and filed an adversary proceeding to recover that check as a preferential transfer under 11 U.S.C. § 547. The bankruptcy court held that the trustee was not precluded from bringing this action. Even though the debtor-in-possession could have brought the preference action, its failure to do so did not preclude the trustee who, as representative of the general unsecured creditors, had different interests than those of the debtor-in-possession. *Id.* at 786. The court held that to bar the trustee from bringing this action would unjustly punish the other unsecured creditors and would disrupt the fundamental bankruptcy principle that like creditors should be treated alike. *Id.*

Here, as with the trustee's claim in *In re Silver Mill*, the Plan Administrator's challenge is for the benefit of the *Ward II* Estate and its general unsecured creditors. The *Ward*

*I* Debtor could have brought this cause of action in the *Ward I* proceeding, but it did not do so because it had an incentive not to challenge the lease: it wanted Montgomery Ward to continue operating at the Department Store. Subsequently, in *Ward II*, the Plan Administrator did have an incentive to challenge the lease because Montgomery Ward was liquidating, and a successful challenge would increase returns to the general unsecured creditors. *See In re Cmty. Hosp. of Rockland County*, 15 B.R. 785, 787 (Bankr. S.D.N.Y. 1981) ("[T]he debtor-in-possession seeks to continue its economic life under the aegis of a reorganization, whereas the trustee in bankruptcy aims to terminate the estate's existence and distribute the property of the estate in accordance with the concept of equality of distribution.")

These misaligned incentives indicate that, when the Plan Administrator raised this challenge to the Lease and Sublease Agreement, he did not have a substantive legal relationship with the *Ward I* Debtor of the kind contemplated in *Taylor*. We conclude that, in bringing this challenge on behalf of the *Ward II* general unsecured creditors, the Plan Administrator was not the privy of the *Ward I* Debtor. *Res judicata*, therefore, does not preclude him from arguing that the Lease and Sublease Agreement was in fact a structured financing. Similarly, because the Plan Administrator was not in privity with the *Ward I* Debtor, the *Ward I* Debtor's actions neither waived the Plan Administrator's right to raise this challenge nor equitably estopped him from doing so.

### B. CAM Expenses

Dika-Ward's claim for CAM expenses is a component of its lease rejection damages claim. For that reason, this

claim may be recharacterized on remand to the Bankruptcy Court. However, whether the Lease and Sublease Agreement is deemed a structured financing or a true lease, Montgomery Ward has no CAM liability under the Jolward II Claim.

If on remand the Bankruptcy Court determines that the Lease and Sublease Agreement is a structured financing, Dika-Ward's only remedy for an alleged breach of that structured financing would be to foreclose on the Department Store and the Land. Dika-Ward has already obtained this remedy: it has foreclosed on the Mortgage, and Dika-Jefferson acquired Montgomery Ward's interest in the Land.

If the Bankruptcy Court finds that the Lease and Sublease Agreement is a true lease, then Dika-Ward's claim for CAM expenses also fails because, as found by the Bankruptcy Court, Dika-Ward has failed to establish that the *Ward II* Debtor is liable for any CAM expenses. Dika-Ward alleged that Montgomery Ward owes $3.2 million in CAM expenses and that, "[t]o the extent Jolward is found to be liable for any such amount, it possesses a claim against the Debtor." Dika-Ward has never alleged or introduced any evidence that Jolward has been found liable for any CAM expenses, and in any event the Ward II Stipulation released Montgomery Ward's CAM liabilities.

### C. Mortgage Claim

The last issue is whether the Mortgage became recourse in *Ward I* under section 1111(b) of the Bankruptcy Code.[7] Generally, this statute provides that if a debtor elects

---

[7] A claim secured by a lien on property of

to continue using encumbered property in its reorganization, the bankruptcy court will grant the nonrecourse creditor, whose claim is secured by an interest in that property, an allowed claim under section 502 as if its security interest had recourse. The key language in this statute concerns the allowance of claims under section 502: Section 502 determines if a creditor can assert a claim against the debtor and in what amount; creditors receive a distribution from the bankruptcy estate based on their allowed claim. 11 U.S.C. § 507.

---

> the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless--
>> (i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or
>> (ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

11 U.S.C. § 1111(b)(1)(A).

16

Mechanically, section 1111(b) affects the distribution to creditors by granting nonrecourse creditors an allowed claim against the debtor that they would not normally receive under section 502(b)(1). In general, section 502(b)(1) allows a creditor's claim to the extent that it would be enforceable against the debtor and the debtor's property. A claim secured by a nonrecourse security interest is, by definition, enforceable only against the debtor's property. A claim secured by a recourse security interest is enforceable against both the collateral and, to the extent the claim exceeds the value of the collateral, against the debtor. If the recourse creditor's claim exceeds the value of the collateral – that is, if the recourse creditor is undersecured – section 506(a) bifurcates the claim into a secured claim for the value of the collateral and an unsecured claim for the deficiency. By treating nonrecourse creditors as if they had recourse, section 1111(b)(1)(A) gives undersecured nonrecourse creditors the unsecured deficiency claim they otherwise would not receive. *680 Fifth Ave. Assoc. v. Mut. Benefit Life Ins. Co.* (*In re 680 Fifth Ave. Assoc.*), 29 F.3d 95, 97 (2d Cir. 1994); Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am. Bankr. L.J. 133, 161 (1979).

This unsecured deficiency claim enables the undersecured nonrecourse creditor to vote on the debtor's plan of reorganization. Absent the unsecured deficiency claim, the undersecured nonrecourse creditor would not be able to vote so long as it received the collateral's appraised value. 11 U.S.C. § 1124(1) (a claim is unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitled the holder of such claim or interest"); 11 U.S.C. § 1126(f) (holders of unimpaired

17

claims are "conclusively presumed to have accepted the plan"); *see* Michael J. Kaplan, *Nonrecourse Undersecured Creditors Under New Chapter 11 – the Section 1111(b) Election: Already a Need for Change*, 53 Am. Bankr. L.J. 269, 270-71 (1979). Without a vote, the nonrecourse undersecured creditor would not be able to challenge the appraisal process. Such a creditor would have lost its contractual state law right to bid on the collateral at a foreclosure sale or renegotiate the loan to allow the debtor to retain the collateral.

Practically, section 1111(b) provides the undersecured nonrecourse creditor with "the benefit it would otherwise obtain from its nonrecourse loan bargain." *In re 680 Fifth Ave. Assoc.*, 29 F.3d at 97; *see also Tampa Bay Assoc., Ltd. v. DRW Worthington, Ltd.* (*In re Tampa Bay Assoc., Ltd*), 864 F.2d 47, 50 (5th Cir. 1989). If the debtor elects to sell the collateral in the Chapter 11 proceeding, the creditor can bid on it. If the debtor elects to continue using the collateral, section 1111(b) ensures that the creditor has the ability to vote on the debtor's plan.

Section 1111(b)'s language and purpose indicate that the recourse transformation is for distribution purposes only. It does not change the nature or terms of a creditor's security interest. *In re DRW Property Co.*, 57 B.R. 987, 992 (Bankr. N.D. Tex. 1986) ("The transformation of non-recourse claims into recourse claims is for distribution purposes only in a Chapter 11 reorganization case where the debtor has been given the power to retain encumbered property (over the objection of the secured creditor) for use in its plan of reorganization.").

18

Dika-Ward's argument overlooks the mechanics of the claims allowance process and, if accepted, would have the practical result of placing the nonrecourse creditor in a *better* position than it would have been outside of bankruptcy, a result not contemplated by Section 1111(b). *In re DRW*, 57 B.R. at 992 ("'It was obviously not intended by according recourse . . . to nonrecourse claims [under section 1111(b)] that the holders of these claims would be given any additional rights under state law.'") (quoting 3 *Norton Bankr. L & Prac.* § 57.02). Because we conclude that section 1111(b)'s transformation is for distribution purposes only, we conclude that, following *Ward I*, the Mortgage remained nonrecourse. Dika-Ward, as holder of that nonrecourse Mortgage, can look only to the property secured by the Mortgage.

### III. CONCLUSION

We conclude that the Plan Administrator was not a privy of the *Ward I* Debtor for purposes of challenging the Lease and Sublease Agreement, and therefore the Plan Administrator is not barred by *res judicata*, equitable estoppel, or waiver from challenging whether that agreement was in fact a structured financing. Moreover, regardless of whether the Lease and Sublease Agreement is a true lease, Dika-Ward has no claim for any unpaid CAM expenses. Finally, Dika-Ward has no claim against the *Ward II* Debtor on account of the Mortgage, as that security interest remained nonrecourse as to Montgomery Ward. Accordingly, we will affirm the Bankruptcy Court's order granting summary judgment for the Plan Administrator, but we will vacate the Bankruptcy Court's order granting summary judgment for Dika-Ward and remand this case to the District Court for remand to the Bankruptcy Court so that the Plan

Administrator may raise its challenge to the Lease and Sublease Agreement.