## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MONTGOMERY WARD, L.L.C., *et al.*, | ) | Case No. 00-4667 (KG) |
| | ) | (Jointly Administered) |
| Reorganized Debtors. | ) | |
| | ) | **Re Dkt. Nos.: 2737, 3631, 6492,** |
| | ) | **6522, 6675 & 6677** |
| _____ | ) | |

## MEMORANDUM OPINION[1]

## INTRODUCTION

Montgomery Ward, LLC ("Montgomery Ward") once operated one of the largest retail

organizations in the United States. To conduct its business, Montgomery Ward and its

affiliates (collectively, the "Debtors") entered into contracts for the construction and

operation of its department stores. Unfortunately, circumstances caused the Debtors to file

for bankruptcy twice within three years. This second case resulted in the filing of various

claims based on the contracts and a lengthy claims resolution process, appeals and ultimately,

remand. Consequently, the Court now has before it the Debtors' Motion to Disallow Certain

Claims [Dkt. Nos. 2737 & 3631], Dika-Ward's Motion for Summary Judgment [Dkt. No.

6492], and the Plan Administrator's Cross-Motion for Summary Judgment [Dkt. No. 6522].

Resolution of these motions turns on whether the agreements between the Debtors and Dika-

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law required
by Federal Rule of Bankruptcy Procedure 7052.

Ward, as assignee, were true leases or a disguised financing arrangement. For the reasons explained below, the Court will deny both summary judgment motions.

## RELEVANT FACTS

Montgomery Ward owned a parcel of land (the "Land") at 2500 W. Jefferson in Joliet, Ill., the site for a planned shopping mall that had not yet been constructed. On April 18, 1973, Montgomery Ward Development Corp. ("MWD") entered into a reciprocal construction, operation and easement agreement (the "RCOEA") with Joliet Mall Associates ("Joliet Assocs.") and Weiboldt Stores, Inc. ("Weiboldt") to develop the Jefferson Square Mall on the Land and two adjacent parcels of land owned by Joliet Assocs., and Weiboldt. Pursuant to the RCOEA terms, MWD and Weiboldt would each construct a department store on their respective parcels of land and pay a pro rata share of common area maintenance expenses ("CAM expenses") as well as other maintenance and utility charges. Upon 90 days' written notice to Joliet Assocs., MWD could opt out of the CAM expenses, relieving it of the obligation to share the costs and expenses of the contractor for the common area.

On January 2, 1974, MWD entered into a contract (the "Ground Lease") with Jolward Associates Limited Partnership ("Jolward") to construct a department store (the "Building") on the Land. Pursuant to the Ground Lease, MWD leased the Land to Jolward, which required Jolward to construct the Building. MWD also agreed to indemnify Jolward for any expenses or liabilities incurred as a result Jolward's leasehold interest in the Land. On

2

October 1, 1974, Jolward leased the Building and the Land to Montgomery Ward & Co., Inc. ("MWC") via a lease and sublease agreement (the "Sublease Agreement").

State Farm Life Insurance Co. ("State Farm"), agreed to finance the construction project in exchange for a note from Jolward, secured by the assignment of Jolward's rights in the Ground Lease, the Building, and Sublease Agreement, including the direct payment of obligations owed by MWC under the Sublease Agreement. Additionally, MWD granted State Farm a non-recourse security interest in its rights to the RCOEA and the Land. Thus, upon default, State Farm had the right to accelerate the obligations under the note and foreclose on the property, without exposing MWD to personal liability.

<u>The First Bankruptcy</u>

In 1997, Montgomery Ward and its affiliated entities filed for chapter 11 bankruptcy protection. State Farm, as assignee of Jolward, filed an unsecured claim for real estate taxes due under the Sublease Agreement and past due CAM expenses. State Farm also filed a secured claim for the balance of the note. Montgomery Ward scheduled two claims by Jefferson Square Mall, LLC ("Jefferson"), which had acquired Joliet Assocs.'s interest in the RCOEA after Joliet Assocs. was placed in receivership. Jefferson had not filed any claims in the bankruptcy proceeding. Pursuant to the reorganization plan, Montgomery Ward assumed the Sublease Agreement. Although Montgomery Ward initially disputed State Farm's claim under the Sublease Agreement, on April 20, 2000, the parties entered into a settlement that resulted in State Farm receiving the full amount of its allowed unsecured

claim and retaining its secured claim. Montgomery Ward's confirmed plan provided for no distribution to State Farm on account of the mortgage claim.

The Second Bankruptcy

On December 28, 2000, less than 18 months after emerging from bankruptcy, Montgomery Ward and affiliates filed a second chapter 11 petition, this time seeking to liquidate all of its assets. State Farm filed a secured claim for the full amount of the note. Jolward filed a claim for unpaid rent, taxes, maintenance, and indemnification of CAM expenses. Jefferson filed three claims for unpaid CAM expenses. Dika-Jefferson, an affiliate of Dika-Ward that purchased the Jefferson Square Mall in 2000, also filed three claims for unpaid CAM expenses. After the claims were filed, Dika-Ward purchased State Farm's secured claim and Jolward's unsecured claim.

Montgomery Ward settled with Dika-Jefferson, satisfying the unpaid CAM expenses claim. Pursuant to a stipulation approved by the Court in October 2001, Montgomery Ward conveyed the Land to Dika-Jefferson by quitclaim deed and paid Dika-Jefferson, which fully satisfied Dika-Jefferson and Jefferson's claims against Montgomery Ward.[2] In 2001, Montgomery Ward rejected the Ground Lease and the Sublease Agreement and objected to Dika-Ward's claim for damages from rejection of the Sublease Agreement. Montgomery Ward's plan administrator (the "Plan Administrator") filed a supplemental objection (the

---

[2] Shortly after the settlement, Dika-Ward initiated a foreclosure action against Jolward and Dika-Jefferson, which was resolved by a consensual foreclosure that conveyed the Land to Dika-Ward.

objection and supplemental objection are jointly referred to as the "Objection") to the claim, asserting that the Sublease Agreement was not a true lease, but rather a structured financing and, as such, limited Dika-Ward's remedy to only the secured collateral.

<u>The Motions</u>

Dika-Ward opposed the objection by filing the Motion for Summary Judgment, arguing that Montgomery Ward was personally liable because the reorganization plan transformed the non-recourse loan into a recourse loan after the first bankruptcy pursuant to Bankruptcy Code § 1111(b) and that Dika-Ward was entitled to rejection damages under the Sublease Agreement. Dika-Ward further argued that Montgomery Ward's first confirmed plan precluded the Plan Administrator from challenging the nature of the Sublease Agreement based on principles of res judicata, equitable estoppel, and waiver. The Plan Administrator then filed the Cross-Motion for Summary Judgment, asserting the same arguments set forth in the Objection.

After a hearing on the Motions, the bankruptcy court granted summary judgment in favor of Dika-Ward based on res judicata. On appeal, the district court affirmed the decision, agreeing with the reasoning of the bankruptcy court, but the Third Circuit reversed, explaining that res judicata did not apply because the Plan Administrator was not a privy of the debtor in the first bankruptcy proceeding. After holding that the Plan Administrator was not barred by res judicata, equitable estoppel, or waiver, the Third Circuit remanded the case

to the bankruptcy court to allow the Plan Administrator to challenge the nature of the Sublease Agreement. *In re Montgomery Ward, LLC,* 634 F.3d 732 (3d Cir. 2011).

Now, on remand, Dika-Ward argues that the Plan Administrator's Supplemental Objection is deficient because the allegation regarding the economic life of the Building is unsupported. Dika-Ward further argues that the Supplemental Objection relies on inapplicable legal authority because the Illinois Uniform Commercial Code does not apply to this real property transaction and, even if it does, the lease constitutes a true lease.

## DISCUSSION

### Jurisdiction

Bankruptcy courts possess jurisdiction over all cases and civil proceedings under title 11 and proceedings under, arising in, or related to a case under title 11. 28 U.S.C. §§ 157, 1334(b). A proceeding is related to a case under title 11 "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which, in any way, impacts upon the handling and administration of the bankruptcy estate." *Sportsman's Warehouse v. McGillis/Eckman Investments-Billings, LLC (In re Sportsman's Warehouse, Inc.)*, 457 B.R. 372, 385 (Bankr. D. Del. 2011) (quoting *Pacor, Inc. v. Higgins (In re Pacor, Inc.)*, 743 F.2d 984, 994 (3d Cir. 1984)). Bankruptcy courts have the statutory authority to hear and determine the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B).

After the confirmation of a reorganization plan, the bankruptcy court's jurisdiction narrows to only matters that bear a "close nexus" to the bankruptcy proceeding, including claims that "affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 167 (3d Cir. 2004). Although it requires the application of relevant state law, interpretation of a lease agreement necessary to the claims allowance process may bear a close nexus to the bankruptcy proceedings that would provide the court with related to jurisdiction over the claim. *See Sportsman's Warehouse*, 457 B.R. at 387.

Here, as part of the claims allowance process, the parties raised the issue of whether the Ground Lease and Sublease Agreement are truly leases or instead constitute a financing arrangement. A determination of the nature of these agreements is imperative to the claims allowance process as the Bankruptcy Code provisions treat leases and financings differently. For example, Bankruptcy Code section 365 provides the debtor in possession the ability to reject or assume executory contracts and unexpired leases. 11 U.S.C. § 365. Under section 365, a true unexpired lease may be rejected, 11 U.S.C. § 365. A financing agreement, however, is not an executory contract and cannot be rejected under section 365. Thus, deciding the appropriate treatment of the claims requires the Court to first determine the character of the agreements. Accordingly, the Court has jurisdiction to determine the true nature of the Sublease Agreement.

<u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56(a), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 47 U.S. 242, 248 (1986). A genuine dispute occurs "when reasonable minds could disagree on the result." *Delta Mills, Inc. v. GMAC Comm. Fin., Inc. (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009). The movant has the burden of showing an entitlement to summary judgment. *Id.*

The purpose of summary judgment is to "isolate and dispose of factually unsupported claims or defenses" and to avoid unnecessary trial where the facts are settled. *Id*. at 104 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Thus, at the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to decide whether there is a genuine issue for trial. *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001) (citing *Celotex*, 477 U.S. at 317); Fed. R. Civ. P. 56(c). The court must view all facts and draw all reasonable inferences from those facts in the light most favorable to the non-movant. *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). Furthermore, any doubt must be construed in the non-movant's favor as well. *Delta Mills*, 404 B.R. at 105.

8

Upon a showing of sufficient evidence by the movant, the burden shifts to the non-movant to rebut the evidence. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*; see also *Petruzzi's IGA Supermarkets v. Darling-Del. Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Additionally, the record must show that the dispute relates to a genuine issue of material fact. *Delta Mills*, 404 B.R. at 105. An alleged factual dispute between parties is insufficient to defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 247-48. Thus, the non-movant must provide supportive arguments or facts rather than conclusory allegations or denials, in order to show the necessity of a trial. *Delta Mills*, 404 B.R. at 105.

Summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## True Lease or Financing Agreement Determination

Although leases and security agreements may be drafted to perform similar functions, bankruptcy law draws an important distinction between them. *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 611 (7th Cir. 2005) (hereinafter *United Airlines I*). The Bankruptcy Code requires a debtor to either assume and fulfill all of its obligations under a lease or relinquish the subject property, leaving the lessor with an entitlement to rejection damages. *See* 11 U.S.C. § 365. In contrast, a debtor who has received a loan in exchange for

a security interest in property is only liable to the lender for the value of the property and any amount of debt exceeding that value is unsecured debt. *See* 11 U.S.C. §§ 506(a), 1129(b)(2)(A).

Simply labeling an agreement a "lease" does not necessarily create a true lease. *In re Dena Corp.*, 312 B.R. 162, 169 (Bankr. N.D. Ill. 2004); *Marriott Family Restaurants v. Lunan Family Restaurants (In re Lunan Family Restaurants)*, 194 B.R. 429, 450 (Bankr. N.D. Ill. 1996). Instead, such a label creates a rebuttable presumption that the agreement is a true lease. *Lunan*, 194 B.R. at 450. Thus the burden of demonstrating that a lease is a disguised security agreement rests with the party challenging the nature of the lease. *In re Pillowtex, Inc.*, 349 F.3d 711, 716 (3d Cir. 2003). *See also In re Buehne Farms, Inc.*, 321 B.R. 239, 243 (Bankr. S.D. Ill. 2005) ("the burden of proving whether the agreements are disguised security agreements or true leases rests with the party who would lose if no evidence were presented.").

The Bankruptcy Code does not provide which features of a transaction define its nature. Such determination depends on state law.[3] *United Airlines I*, 416 F.3d at 615. *Pillowtex,* 349 F.3d at 716; *Dena Corp.*, 312 B.R. at 169. Illinois law, which governs the agreements, does not provide statutory authority for distinguishing real estate leases from

---

[3] It should be noted that a "state law that identified a 'lease' in a formal rather than a functional manner would conflict with the Code" and would not control, while one that identifies a lease based on factors does not conflict. *United Airlines I*, 416 B.R. at 615.

security agreements.[4] Instead, utilizing Illinois common law, courts look to the economics of the transaction, rather than its label to determine the nature of the agreement. *See e.g. Streator Nat'l. Bank. v. Arquilla*, 485 N.E.2d 868, 869 (Ill. App. 3d 1985) (instead of obtaining an outright loan, financing for a construction project was structured through a sale and leaseback transaction); *Janssen Bros., Inc. v. Northbrook Trust & Savings Bank*, 299 N.E.2d 431, 432 (Ill. App. 2d 1973) (holding, after a hearing, that a deed transfer and leaseback transaction intended to establish a security interest). Courts must analyze the "economic reality" of the agreement at issue to determine its true nature. *Dena Corp.*, 312 B.R. at 169; *see also Pillowtex*, 349 F.3d at 723; *Liona Corp., N.V. v. PCH Assocs. (In re PCH Assocs.)*, 804 F.2d 193 (2d. Cir. 1986) ("the bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than 'the locus of the title, the form of the transaction or the fact that the transaction is denominated as a "lease,"' to determine whether the transaction embodies a 'true lease' or a

---

[4] The Illinois Uniform Commercial Code, which applies to goods, provides that a purported lease instead creates a security interest if the consideration paid under the lease is an obligation for the term of the lease that cannot be terminated under the lease and :

    (1)    the original term of the lease is equal to or greater than the remaining economic life of the goods;

    (2)    the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become owner of the goods;

    (3)    the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or

(4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

810 ILL COMP. STAT. ANN. 5/1-203(b) (LexisNexis 2012).

financing transaction."). Accordingly, the determination of whether a lease is a true lease or a financing agreement depends on the circumstances of the case. *Lunan* 194 B.R. at 450; *See also* S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978); 810 ILL. COMP. STAT. ANN. 5/1-203(a) (LexisNexis 2012) ("Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.").

Although the Bankruptcy Code fails to provide any factors to consider in making such a determination of the character of an agreement, courts often look to the legislative history of Bankruptcy Code section 365 for guidance. *See Internat'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir. 1991); *In re Moreggia & Sons, Inc.*, 852 F.2d 1179 (9th Cir. 1988); *Lunan*, 194 B.R. at 450; *In re KAR Dev. Assocs., L.P.*, 180 B.R. 629, 635 n. 8 (D. Kan. 1995). The widely cited portion of section 365's legislative history provides:

> The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease." The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration [or] for nominal consideration indicates that the transaction is a financing lease or a lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term, In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property.

S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978).

Courts have used several factors to analyze the economic realities of a transaction when making a determination regarding the nature of an agreement. A primary indicator of the agreement's nature is how ownership is allocated. *Dena Corp.*, 312 B.R. at 169. An agreement cannot be a true lease where the purported lessor retains no ownership interest in the property at the end of the lease or the economic value of the property was exhausted. *Id.*; *United Air Lines, Inc. v. HSBC Bank USA (In re UAL Corp.)*, 307 B.R. 618, 632 (Bankr. N.D. Ill. 2004) (explaining that true leases revert back to the lessor with substantial value remaining). In addition to the allocation of ownership risk, courts have also considered factors such as whether:

(i)   the "rental" payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment[;]

(ii)  the purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction;

(iii) the property was purchased by the lessor specifically for the lessee's use;

(iv)  the transaction was structured as a lease to secure certain tax advantages;

(v)   the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance.

*Dena Corp.*, 312 B.R. at 169 (quoting *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.)*, 155 B.R. 824, 838 (Bankr. N.D.N.Y. 1993)).

In other words, an agreement is not a true lease where the obligations under the lease significantly differ from those under ordinary landlord/tenant agreements. *Lunan*, 194 B.R. at 450 (quoting *PCH Assocs.*, 804 F.2d at 200). "'Rent' that represents the cost of funds for

13

capital assets or past operations rather than ongoing inputs into production has the quality of debt." *United Airlines I*, 416 F.3d at 613. However, a lease is not a security interest simply because the consideration equals or exceeds the fair market value of the property, or the lessee assumes the risk of loss, agrees to pay maintenance expenses, or has an option to renew the lease or purchase the property at a price equal or greater than the fair market value of the property. *Sierra Diesel Injection Service, Inc. v. Burroughs Corp., Inc*., 890 F.2d 108 (9th Cir. 1989) (holding that a lease is a financing agreement where alleged lessee was responsible for all maintenance costs, in addition to taxes and indemnification for the lessor's loss).

*United Airlines I* is particularly instructive. There, an airline was a lessee under a 30 year lease with the airport for 128 acres of land. In order to finance improvements of the airline's facilities, the state development authority issued $155 million in bonds and gave the proceeds to the airline. The airline subleased 20 acres of the land to the development authority for a total rent of one dollar. The development authority then leased the 20 acres back to the airline for rent in an amount equal to the accrued quarterly interest on the bonds plus an administrative fee. The leaseback also provided for a final $155 million payment at the conclusion of the lease term. Not only did the leaseback include a provision terminating both the leaseback and sublease agreement upon prepayment of rent, but the leaseback also included a clause requiring payment in full even if the airline was unable to use or obtain economic benefit from the 20 acres.

The court found that this arrangement was not a true lease because the rent was measured by the amount borrowed, not the value of the land; the development authority retained no interest in the land at the conclusion of the lease; the final balloon payment was atypical in a true lease; and, generally, prepayment under a true lease secures a tenant's right to occupy the property whereas prepayment under the leaseback terminated the lease agreements. The court noted that many financing agreements may be true leases where the lessor owns the property and finances the lessee's acquisition of such property. However, where the lessee already possessed an interest in the property and cannot terminate its obligations in a leaseback transaction, the lessee simply uses an asset to secure an extension of credit. *United Airlines I*, 416 B.R. 617. Collateralizing land to secure credit is, of course, financing.

*The Terms of the Agreements*[5]

Here, as of April 18, 1973, MWD owned the parcel of land that was the subject of the ground lease. (Exh. M,[6] RCOEA at 1). MWD was required to complete construction of the Building no later than 14 months after construction began. (Exh. M, RCOEA at ¶ 8). On January 2, 1974, MWD leased the land to Jolward, but did not require Jolward to pay rent until it secured permanent financing for the Building's construction. (Exh. M, Ground Lease

---

[5] Based on the parties' pleadings, the majority of the material facts used in the following analyses do not appear to be in dispute.

[6] As the record contains several copies of identical documents, for convenience, unless otherwise stated, all citations refer to exhibits attached to the Response of Dika-Ward [Dkt. No. 6471].

at Schedule B). After Jolward secured the financing, the Ground Lease obligated it to pay $15,000 quarterly plus, if MWD became subject to a similar obligation under the Sublease, three-fourths of one percent of MWC's gross sales over $15,000. (Exh. M, Ground Lease at Schedule B). Jolward had no right to terminate the Ground Lease. (Exh. M, Ground Lease at ¶ 7(b)).

On October 1, 1974, Jolward subleased the property to MWC for: a rental payment of $4,250 for the period of September 30, 1974 to November 25, 1974; no rent due from November 26-30, 1974; four quarterly payments of $21,993.75; followed by 36 quarterly payments of $79,368.75; and, after that, quarterly payments of $91,417.50 until November 30, 2004, the expiration of the lease term, for a total of $10,262,900. (Exh. M, Sublease at Schedule B). The Sublease Agreement could be extended for up to four consecutive five year terms with quarterly rent installments of $38,250 for the term of the extension. (Exh. M, Sublease at 4; Schedule B at ¶ 6).

The Sublease Agreement permitted MWC to construct additional improvements on the Land and request reimbursement from Jolward, with the understanding that the rent under the Sublease Agreement would increase to finance the reimbursement. (Exh. M, Sublease at ¶ 11(b)). MWC was prohibited from terminating the lease under any circumstances, even those that diminished the property's economic usefulness. (Exh. M, Sublease at ¶ 6). Upon the occurrence of any event that rendered the property economically useless to MWC, the Sublease Agreement required MWC to purchase Jolward's interest so long as any note was

16

outstanding and reduced the price by any award received by Jolward on account of such occurrence. (Exh. M, Sublease at ¶¶12, 14, 15).

Provided that MWC did not exercise an option to extend the Sublease Agreement, MWC was required to purchase the property for a percentage, which was based on the date of purchase, of an amount that the Sublease Agreement refers to as the "Lessor's Cost." (Exh. M, Sublease at ¶ 15 and Schedule C).[7] The Sublease Agreement provided that Jolward would transfer its interest in consideration of the required purchase price and all prior rental payments. (Exh. M, Sublease at ¶ 16). If MWC chose to extend the Sublease Agreement, Jolward had the option to require MWC to pay 75% of the aggregate rent[8] due during the extension on November 30, 2004, and MWC would be entitled to remain on the property without making rental payments or giving further notice of term extensions.[9] (Exh. M, Sublease at ¶ 15(c)). Pursuant to the Sublease Agreement, MWC's purchase of Jolward's interest would be free of only the mortgage, and not any other consensual liens. (Exh. M, Sublease at ¶ 17).

---

[7] Notably, the uncorrected Sublease Agreement required higher installment payments and provided that the "Lessor's Cost" was $4,207,500 (Exh. D, Sublease at Schedule C), but in the corrected Sublease Agreement, the "Lessor's Cost" was $3,825,000 and the installment payments were as previously described. (Exh. M, Sublease at Schedule C).

[8] The aggregate rent due under the extension term would be $765,000, 75% of which totals $573,750.

[9] Specifically, the Sublease provides that Montgomery Ward "shall be entitled to occupy the Leased Premises for the five years ending November 30, 2009 without payment of Basic Rent hereunder and without giving further notice to its election to extend the term hereof."

The same day, Jolward, MWD and State Farm executed a mortgage agreement using the Ground Lease, the Building and the Land to secure a loan for $3,748,500, without subjecting MWD to personal liability on the mortgage note. (Exh. D, Mortgage at 1-4). Additionally, Jolward assigned its interest in the Sublease Agreement to State Farm to secure the mortgage note. (Exh. I, Assignment of Lease at 3).

On November 26, 1974, Jolward and State Farm executed a mortgage note in the amount of $3,748,500, with an annual interest rate of 8.25%, payable in an initial payment of interest on the unpaid principal, 40 quarterly installment payments of $76,854.41, followed by 80 quarterly installment payments of $89,645.00, for a total of $10,245,776.40, plus the initial interest payment. (Exh. D, Mortgage Note at 1). The mortgage note matured on December 1, 2004 and required a final payment of the remaining principal balance on that date. (Exh. D, Mortgage Note at 2).

### *Dika-Ward's Motion for Summary Judgment*

An analysis of the economic realities belies any claim of a lease transaction. Viewing the facts, and the reasonable inferences therefrom, in the light most favorable to the Plan Administrator, despite the labels of "lease" and "rent,"these transactions clearly show that the transactions functioned as secured financing for the Building's construction and acquisition.

18

*Ownership at the end of the Sublease Agreement remained with Montgomery Ward.*

Under the agreements, at the end of the Ground Lease, including any potential term extensions, Montgomery Ward retained ownership of the Land. It is important to note that before and throughout the multiple lease transactions, Montgomery Ward remained the owner of the Land. Similar to the transaction in *United Airlines I*, it appears that Montgomery Ward used one of its assets to finance the construction and acquisition of the Building. Furthermore, at the end of the Sublease Agreement, Montgomery Ward was required to purchase Jolward's interest, resulting in Montgomery Ward's ownership of the Building as well as the Land. Additionally, the result of Montgomery Ward's option to extend, under any circumstance, is strikingly similar to the purchase requirement as nearly equal amounts were to be paid on November 4, 2004 and Montgomery Ward was entitled to remain on the property indefinitely without rental payment.

*The rental payment calculation strongly correlates with the loan obligations.*

Although not identical in amount, Montgomery Ward's rental payments strongly correlate to Jolward's obligation under the loan. From December 1, 1975, until September 1, 2004, the rental payments only exceeded the loan payments by roughly $2,000.[10] Furthermore, the payments of the loan obligation were due on the first day of March, June, September, and December. It is more than a mere coincidence that the rental payments under the Sublease Agreement were due on the last day of February, May, August, and November,

---

[10]   The difference between the first set of rental payments during this period is $2,514.34 and the difference between the second set of payments is $1,773.50.

the days immediately preceding the due dates of the loan payments. Thus, the payment obligations under the Sublease Agreement and the mortgage note are so closely aligned that it is difficult to find a relationship between the rental payments and the value of the Land or the Building.

> *Montgomery Ward owned the property, and leased the Land to Jolward for Montgomery Ward's own use.*

Montgomery Ward owned the Land at all relevant times. Jolward leased the Land from Montgomery Ward for the specific purpose of constructing the Building for Montgomery Ward's use, evidenced by the Sublease Agreement. Absent construction of the Building, it does not appear that Jolward had a business interest or other purpose for leasing the Land.

> *The purchase price corresponds with the loan obligations, not the fair market value of the property.*

The Sublease Agreement required Montgomery Ward to purchase Jolward's interests upon expiration of the Sublease Agreement so long as there was a note outstanding. The Plan Administrator asserts that the final payment of the balance of the principal on the loan is $506,446.87. (Reply of the Plan Administrator, Dkt. No. 6677 at Exh. A). At the same time, Montgomery Ward's required purchase price at the end of the Sublease Agreement was 14.7% of $3,825,000, or $562,275 and the required upfront payment upon an extension of the Sublease Agreement was $573,750. These amounts are all strikingly similar and suggest a strong relationship between the loan obligation and the rental payments. Furthermore, no

evidence has been provided as to the value of the property at any time covered by the Sublease Agreement. Dika-Ward has thus failed to demonstrate that these amounts relate to property value rather than the loan obligations and rebut the assertions of the Plan Administrator.

*The Sublease Agreement required Montgomery Ward to assume obligations associated with property ownership.*

Under the Sublease Agreement, Montgomery Ward was required to pay all taxes, assessments and "all other governmental charges" even if not contemplated by the parties, all taxes assessed against the rental payments as well as property insurance, liability insurance and any other insurance required by the mortgage. (Exh. M, Sublease Agreement at 7, 13). Additionally, even though the Ground Lease required the same responsibilities of Jolward, Montgomery Ward assumed those responsibilities as well as the Ground Lease rental payment obligations. (Exh. M, Sublease Agreement at ¶ 23(b)). Consequently, Montgomery Ward was required to perform all ownership obligations on both the Land and the Building over the duration of the Sublease Agreement.

*Additional Considerations*

In comparing the transactions to those in United Airlines I, the purchase price under the Sublease Agreement bears similar characteristics to a balloon payment. Additionally, prepayment or, under the Sublease Agreement, the exercise of the early purchase option, terminated the Sublease Agreement. Labeling a transaction that is the functional equivalent of prepayment as a purchase does not change the fundamental character of the action.

Furthermore, Jolward sought financing to build a structure on real property that it did not own and the Building was designed for Montgomery Ward to conduct its business, not Jolward. The inference drawn in from these facts shows that Jolward clearly did not intend to act as a lessor, but rather to construct the Building and ultimately transfer it to Montgomery Ward. Accordingly, as the record fails to show that Dika-Ward is entitled to summary judgment as a matter of law, the Court must deny Dika-Ward's Motion for Summary Judgment.

### *Plan Administrator's Cross-Motion for Summary Judgment*

Viewing the facts and reasonable inferences therefrom in the light most favorable to Dika-Ward, the Plan Administrator has failed to show that no genuine issue of material fact exists as to the nature of the agreements.

#### *The rental payments relate to the use of the Land.*

The initial payment structure under the Sublease Agreement provided that during the first year, MWC would make quarterly payments that amounted to roughly 25-33% of the later quarterly payment amounts. During the first year of the Sublease Agreement, MWD was required to complete the construction of the Building. Therefore, the increase in the quarterly payments likely related to the Land's use as quarterly rents increased upon the completion of the Building, enabling MWC to operate its business.

*The intent behind entering into the agreements and the fair market value of the Land are in dispute.*

Dika-Ward argues that the parties intended that the Ground Lease and Sublease Agreement to be true leases as they were executed between three different parties, MWD, Jolward, and MWC, and the agreements were treated as leases under the first reorganization plan. The Plan Administrator argues that the parties intended to finance the construction of the building and did so by structuring the financing through lease agreements. Additionally, while the parties allude to a relationship, or absence thereof, to the fair market value of the Land, neither party has provided any evidence regarding the Land's value. To put it simply, the parties clearly dispute a material fact, the intent behind entering into the agreement. Accordingly, the Court cannot grant summary judgment cannot in favor of the Plan Administrator.

## CONCLUSION

For all of the foregoing reasons, the Court will enter an order denying both Dika-Ward's Motion for Summary Judgment and the Plan Administrator's Cross-Motion for Summary Judgment.

Dated: April 20, 2012

Kevin Gross, U.S.B.J.

23